LITTON SYSTEMS, INC. et al., Plaintiffs,

v.

AMERICAN TELEPHONE AND TELEGRAPH COMPANY et al., Defendants.

NEW YORK TELEPHONE CO., INC. et al., Counterclaimants,

v.

LITTON SYSTEMS, INC. et al., Counterdefendants.

No. 76 Civ. 2512 (WCC).

United States District Court, S. D. New York.

March 4, 1980.

Theodore F. Craver, Larry L. Yetter, Litton Industries, Inc., Beverly Hills, Cal., Howrey & Simon, Washington, D. C., Curtis, Mallet-Prevost, Colt & Mosle, New York City, for plaintiffs; William Simon, John Bodner, Jr., Francis A. O'Brien, Ralph Gordon, Kevin P. McEnery, Washington, D. C., Peter E. Fleming, Jr., New York City, of counsel.

Dewey, Ballantine, Bushby, Palmer & Wood, New York City, for defendants; Leonard Joseph, O. Nile Bell, J. Paul McGrath, Harvey Kurzweil, New York City, of counsel.

## OPINION AND ORDER

CONNER, District Judge:

This antitrust action is before the Court on objections filed by both sides, pursuant to 28 U.S.C. § 636(b)(1), to the Recommended Decision of Magistrate Kent Sinclair, Jr. submitted September 21, 1979, on defendants' motion for judgment of dismissal on the pleadings or for partial summary judgment.

The complaint charges violations of Sections 1 and 2 of the Sherman Act, 15 U.S.C. §§ 1 and 2, by conspiring and attempting to restrain trade in and to monopolize, and by monopolizing, the interstate sale and leasing of telephone terminal equipment, including private branch exchange ("PBX") and key telephone system ("KTS") equipment designed to interconnect defendants' telephone trunk lines selectively with a number of individual telephones within an office, store, plant or other facility. The complaint alleges that defendants sought to and did accomplish these illegal objectives by, *inter alia*, (1) filing with the Federal Communications Commission ("FCC") and with state regulatory agencies self-effectuating tariffs which provided that terminal equipment supplied by others could be interconnected with defendants' trunk lines only if there was interposed between them an interface device provided and maintained by defendants, said tariffs being supported by "incomplete, misleading and erroneous information"; (2) falsely disparaging the terminal equipment offered by competitors, including plaintiffs; (3) deliberately making the required interface equipment unnecessarily complicated, expensive and inefficient and delaying its production, installation and service; (4) predatorily pricing defendants' terminal equipment below its production cost; and (5) depriving plaintiffs of fair access to state regulatory agencies by improper payments to officials thereof and illegal political contributions.

Plaintiff Litton Systems, Inc. ("Litton") is a Delaware corporation with its principal office in Beverly Hills, California, selling products and services in a wide range of business areas, including aerospace, communications, computers, shipbuilding and minerals exploration. Until 1974, its wholly-owned subsidiary, plaintiff Litton Business Telephones Systems, Inc. ("BTS") manufactured and sold telephone terminal equipment in competition with defendants. The complaint alleges that BTS sustained losses and eventually went out of business as a result of defendants' antitrust violations.

Defendants (collectively referred to hereinafter as "AT&T" or "Bell") include American Telephone & Telegraph Co.; its manufacturing subsidiary, Western Electric Company; its research subsidiary, Bell Telephone Laboratories, Inc.; and seven of its fully- or majority-owned regional operating companies. Intrastate telephone service is provided by the regional operating companies, whose rates and practices operations are controlled by state and local regulatory agencies, while interstate service is provided by AT&T's Long Lines Division under regulation by the FCC.

After extensive discovery, defendants moved for judgment of dismissal on the pleadings on the grounds that all aspects of operation of the Bell system, specifically including the interconnection of equipment thereto, are subject to pervasive regulation by the FCC and by state regulatory commissions, and that the purposes of such regulation are incompatible with the objectives of the antitrust laws, so that such

activities are impliedly immune from the antitrust laws under the doctrine of such decisions as *Pan American World Airways, Inc. v. United States*, 371 U.S. 296, 83 S.Ct. 476, 9 L.Ed.2d 325 (1963) (*"Pan Am"*); *Hughes Tool Co. v. Trans World Airlines, Inc.*, 409 U.S. 363, 93 S.Ct. 647, 34 L.Ed.2d 577 (1973) (*"Hughes Tool"*); *Gordon v. New York Stock Exchange*, 422 U.S. 659, 95 S.Ct. 2598, 45 L.Ed.2d 463 (1975) (*"Gordon"*); *United States v. National Association of Securities Dealers*, 422 U.S. 694, 95 S.Ct. 2427, 45 L.Ed.2d 486 (1975) (*"NASD"*) and *Parker v. Brown*, 317 U.S. 341, 63 S.Ct. 307, 87 L.Ed. 315 (1943), as specifically applied to the regulation of the market in ancillary telephone equipment in such cases as *Essential Communications Systems, Inc. v. American Tel. & Tel.*, 446 F.Supp. 1090 (D.N.J.1978), *rev'd*, 610 F.2d 1114 (3d Cir. 1979) rehearing denied, No. 78–2521 (3d Cir., filed November 23, 1979). Defendants alternatively moved for partial summary judgment or judgment on the pleadings on the ground that their alleged activities in attempting to influence administrative action were shielded from antitrust liability by the First Amendment under the *"Noerr-Pennington"* doctrine established by *Eastern R.R. Presidents Conference v. Noerr Motor Freight, Inc.*, 365 U.S. 127, 81 S.Ct. 523, 5 L.Ed.2d 464 (1961) (*"Noerr"*) and reaffirmed in *United Mine Workers v. Pennington*, 381 U.S. 657, 669–70, 85 S.Ct. 1585, 1592–93, 14 L.Ed.2d 626 (1965) (*"Pennington"*). Plaintiffs, on the other hand, contend that defendants, by their false and misleading submissions to the regulatory agencies, have attempted to subvert the regulatory process, so that the "sham" exception to the *Noerr-Pennington* doctrine, recognized in such cases as *California Motor Transport Co. v. Trucking Unlimited*, 404 U.S. 508, 92 S.Ct. 609, 30 L.Ed.2d 642 (1972) (*"California Motor Transport"*), is applicable.

The motions were referred to Magistrate Sinclair for recommended decision pursuant to 28 U.S.C. § 636(b)(1)(B). In an unusually exhaustive and meticulous Recommended Decision 270 pages in length, exclusive of a 58-page appendix, Magistrate Sinclair recommended granting of the motion and dismissal of the entire complaint. He concluded that plaintiffs' "core" claims relating to defendants' activities before the FCC and the state regulatory commissions were immunized from antitrust liability in view of the pervasive regulation of the industry and because the specific conduct in question had, for the most part, been expressly sanctioned by the responsible agencies. He further recommended that the "peripheral" claims relating to defendants' alleged "business torts" such as disparagement of competitive terminal equipment be dismissed as ancillary to the "core" activities and likewise subject to remedial action by the agencies.

In the alternative, Magistrate Sinclair recommended stay of the action and referral of all the claims therein to the FCC for consideration in the first instance, pursuant to the principle of primary jurisdiction, as articulated, for example, in *United States v. RCA*, 358 U.S. 334, 79 S.Ct. 457, 3 L.Ed.2d 354 (1958).

The Magistrate further recommended denial of defendants' motion for partial summary judgment under *Noerr-Pennington* on the ground that there were material issues of fact bearing on the "sham" exception, particularly with respect to defendants' intentions relative to their challenged activities before the regulatory agencies.

In support of and in opposition to their exceptions to the Recommended Decisions, the parties have made massive and numerous written submissions. After due consideration thereof, and of the authorities cited therein, the Court has concluded, with due deference to the painstaking and conscientious effort of Magistrate Sinclair, that his recommendations that the action be dismissed on grounds of implied antitrust immunity or stayed pending referral for initial review by the FCC cannot be adopted. His recommended denial of defendants' motion to dismiss under the *Noerr-Pennington* doctrine is adopted. Defendants' motions are therefore denied in their entirety.

## IMPLIED IMMUNITY

### General Principles

There is an inherent and obvious tension between the emphasis on unrestrained competition underlying the antitrust laws and the "public interest" rationale underlying other instances of governmental regulation of business activity. The Sherman Act is premised on the theory that "the unrestrained interaction of competitive forces will yield the best allocation of our economic resources," *Northern Pacific Ry. v. United States*, 356 U.S. 1, 4, 78 S.Ct. 514, 517, 2 L.Ed.2d 545 (1958), and, to some extent, on the political and social desirability of smaller, competitive businesses, see *United States v. Falstaff Brewing Corp.*, 410 U.S. 526, 540–43, 93 S.Ct. 1096, 1104–06, 35 L.Ed.2d 475 (1973) (Douglas, J., concurring in part); *Northern Pacific Ry., supra,* 356 U.S. at 4, 78 S.Ct. at 517. The assumption underlying economic regulation, on the other hand, is that unrestrained competition in certain industries will not adequately serve the public interest either because the activity involved is, from the standpoint of economic efficiency, a "natural monopoly" (certain utility activities, for example, see *Otter Tail Power Co. v. United States*, 410 U.S. 366, 369, 93 S.Ct. 1022, 1025, 35 L.Ed.2d 359 (1973)); or because the business conduct involved should be judged by criteria other than or in addition to competitiveness, such as convenience to the public or nondiscrimination in providing services (e. g., certain activities of common carriers, see *Georgia v. Pennsylvania R.R. Co.*, 324 U.S. 439, 453, 456–67, 65 S.Ct. 716, 725–30, 89 L.Ed. 1051 (1945)), or the industry's importance to foreign commerce of the United States (e. g., the shipping industry, see *Far East Conference v. United States*, 342 U.S. 570, 573, 72 S.Ct. 492, 493, 96 L.Ed. 576 (1972); Note, *Antitrust and the Shipping Industry*, 12 N.Y.U.J. Int'l L. & Pol. 115 (1959)), or the economic health of the regulated industry, see, e. g., *Gordon, supra*, 422 U.S. at 689, 95 S.Ct. at 2614 (protection of investors and stock exchanges). See generally II A. Kahn, The *Economics of Regulation* : Principles and Institutions (1971). Where Congress has established a regulatory agency to supervise the conduct of business within an industry according to a standard of "public interest," therefore, subjecting a regulated firm to antitrust liability based on competitiveness factors alone, as the antitrust laws require, see, e. g., *National Society of Professional Engineers v. United States*, 435 U.S. 679, 688, 98 S.Ct. 1355, 1363, 55 L.Ed.2d 637 (1978) (§ 1 case), may result in imposing on the business standards of conduct inconsistent with those established by Congress for that industry.

■ Regulated industries "are not per se exempt from the Sherman Act," *Georgia v. Pennsylvania R. R. Co.*, 324 U.S. 439, 456, 65 S.Ct. 716, 725, 89 L.Ed. 1051 (1945), even if the specific conduct complained of has been expressly approved by the agency charged with regulatory responsibility. *United States v. Radio Corp. of America*, 358 U.S. 334, 79 S.Ct. 457, 3 L.Ed.2d 354 (1959). Rather, a court determining the applicability of the Sherman Act to a regulated industry must consider whether and to what extent Congress intended to exempt activities of that industry from the antitrust laws.

In some industries, Congress has recognized the potential for conflict between the regulatory statutes and the antitrust laws and has expressly granted antitrust immunity for specified conduct; for example, in the interstate telephone field, FCC-approved mergers of telephone companies are expressly exempted. 47 U.S.C. § 221(a) (1970). No such express immunity is claimed in this case.

■ Courts have, in addition, found an implied antitrust immunity for certain activities in other industries covered by a regulatory scheme. Such immunity has been implied in two restricted instances: (1) when the agency's regulation of the industry is so pervasive that Congress may be assumed to have determined that unrestrained competition will not adequately protect the public interest, see *Otter Tail Power Co., supra*, 410 U.S. at 373–4, 93 S.Ct. at 1027–28; *Silver v. New York Stock Exchange*, 373 U.S. 341, 358–60, 83 S.Ct.

1246, 1257–1258, 10 L.Ed.2d 389 (1963); *RCA, supra,* 358 U.S. at 348–49, 79 S.Ct. at 465–66; see also *Cantor v. Detroit Edison Co.,* 428 U.S. 579, 584, 96 S.Ct. 3110, 3114, 49 L.Ed.2d 1141 (1976) (discussion of pervasive state regulation); or (2) when a regulatory agency is authorized by statute to exercise, and has in fact exercised, authority over the particular practice under attack (as contrasted with the general field of activity) in a way which effectuates the regulatory scheme, *Gordon, supra; NASD, supra; Pan Am, supra; Keogh v. Chicago & Northwestern Ry. Co.,* 260 U.S. 156, 43 S.Ct. 47, 67 L.Ed. 183 (1922); see *Silver, supra,* 373 U.S. at 361–63, 83 S.Ct. at 1259–60.

The Supreme Court has articulated an exacting standard for the implication of antitrust immunity: "Repeal of the antitrust laws is not favored and not casually to be allowed. Only where there is a 'plain repugnancy between the antitrust and regulatory provisions' will repeal be implied." *Gordon, supra,* 422 U.S. at 682, 95 S.Ct. at 2611. "Repeal is to be regarded as implied only if necessary to make the [regulatory scheme] work, and even then only to the minimum extent necessary." *Silver, supra,* 373 U.S. at 357, 83 S.Ct. at 1257.

In an unusual article arguing the legal merits of a pending action—the government civil antitrust suit against the principal defendant here (*United States v. American Telephone & Telegraph Co.,* 427 F.Supp. 57, D.D.C.)—the author distilled from the case law the following five criteria for determining whether antitrust immunity should be implied:

"(1) the conduct challenged in the antitrust complaint, as well as rates, entry, and investment in the market, should be continually subject to the supervisory authority of the regulatory agency; (2) the agency should have the power to grant the relief requested by the antitrust plaintiff; (3) the benefits of competition should enter into the agency's public interest calculation; (4) agency expertise should be particularly useful in deciding issues in the antitrust suit; and (5) the antitrust suit should involve important regulatory policy questions." Note, *AT&T and the Antitrust Laws: A Strict Test for Implied Immunity,* 85 Yale L.J. 254, 258 (1975).

The author added:

"Any claim of immunity which can meet all of these criteria should certainly succeed."

Despite the author's conclusion that all five of the criteria are satisfied in the government's case against AT&T, as discussed more fully hereinafter, two judges have successively ruled in that case that there was no implied immunity for the activities of AT&T.

*Legislative History*

Because the touchstone of implied immunity is congressional intent, any discussion of implied immunity in the telephone industry must begin with a consideration of the content and legislative history of the Federal Communications Act.

The history of federal regulation of interstate communications carriers began with the Mann-Elkins Act of 1910, Pub.L. No. 218, 36 Stat. 539 which amended the Interstate Commerce Act to bring communications carriers under the jurisdiction of the Interstate Commerce Commission ("ICC"), 36 Stat. at 544, and established a mechanism for their regulation. A decade later, recognizing the desirability of unification of telephone networks and elimination of duplicative facilities, Congress, in the Willis-Graham Act of 1921, Pub.L. No. 15, 42 Stat. 27, empowered the ICC to grant antitrust exemption to mergers or acquisitions of local telephone companies which it found to be in the public interest.

In 1934, the regulatory apparatus was drastically revised by the Federal Communications Act, 47 U.S.C. §§ 151 *et seq.* ("the 1934 Act"), which created a separate agency, the FCC, with authority to regulate the interstate telephone, telegraph and radio communications industries. Congress expressly recognized that, by a series of mergers and consolidations, and by the creation of holding companies, AT&T had achieved a monopoly position in interstate telephone

toll and private line services. H.Rep.No. 1273, Pt. III, No. 1, 73d Cong., 2d Sess. 856–60 (1934); S.Rep.No.781, 73d Cong., 2d Sess. at 2 (1934). Although Congress expressed the belief that the ICC should have scrutinized these annexations more carefully for possible abuses, H.Rep.No.1273, supra at 930–32, it reaffirmed the ICC's authority to grant antitrust exemptions for mergers in the public interest, 47 U.S.C. § 221, while reinforcing the ICC's power to insure the provision of efficient service at reasonable and non-discriminatory rates. 47 U.S.C. § 201; see S.Rep.No.781, 73d Cong., 2d Sess., 1–5 (1934).

The 1934 Act gives the FCC broad regulatory powers over telephone carriers, leaving to the FCC itself the responsibility for determining the scope of these powers. S.Rep.No.781, 73d Cong., 2d Sess. 1–2 (1934). Among the powers central to its mission are the control over the construction of new telephone lines and facilities and the discontinuance of service over existing facilities, such entry and exit requiring an FCC certificate of public convenience and necessity. 47 U.S.C. § 214(a), (b). Upon allowing entry of a new carrier, the Commission may order interconnection of its lines with those of existing carriers. 47 U.S.C. § 201(a).

The 1934 Act declares illegal any unjust, unreasonable, discriminatory or preferential charge or practice. 47 U.S.C. §§ 201(b), 202(a). At least ninety days before implementing any new charge or practice, the carrier must file with the Commission and publish generally a tariff setting forth the proposed charge or practice. 47 U.S.C. § 203 (1978 Supp.). No company may function as a communications carrier unless such tariffs have been filed, 47 U.S.C. § 203(c), and the carrier must not deviate from the tariff until it is modified as provided by law. 47 U.S.C. § 203(b), (c).

The Commission may conduct hearings to determine the reasonableness of the charge or practice and may suspend its effective date for a maximum of five months. 47 U.S.C. § 204(a) (Supp.1978). If it determines that the charge or practice is unrea-

sonable, the Commission may promulgate a substitute which it deems just and reasonable. 47 U.S.C. § 205(a). It may enforce its orders by injunction and by a fine of $1,000 for each day of violation. 47 U.S.C. §§ 205(a), (b). And an injured party may obtain damages for unreasonable discrimination in a proceeding before the Commission or in an action in a district court. 47 U.S.C. § 207.

In aid of its determination of the reasonableness of rates and charges, the Commission regularly evaluates the property of the carrier, 47 U.S.C. §§ 213(a), (c), and is empowered to require the filing of annual reports, and to prescribe accounting practices and allowable depreciation charges. 47 U.S.C. §§ 219, 220.

In the 1934 Act, there is no express direction that the FCC, in determining the reasonableness of rates or practices, should take into account antitrust considerations. However, the power to enforce certain sections of the Clayton Act is conferred on the FCC by Section 11 of that Act, 15 U.S.C. § 21. That section specifically provides that no judgment of the FCC "shall in anywise relieve or absolve any person from any liability under the antitrust laws." 15 U.S.C. § 21(e). Moreover, Section 414 of the 1934 Act negates any inference that the federal regulatory scheme was intended to supplant the antitrust laws:

> "Nothing in this chapter contained shall in any way abridge or alter the remedies now existing at common law or by statute, but the provisions of this chapter are in addition to such remedies." 47 U.S.C. § 414.

*Administrative History*

A major portion of Magistrate Sinclair's Recommended Decision (pages 32 to 166) is devoted to an exhaustive description of the elaborate system of regulations and rules which the FCC has promulgated for the purpose of regulating the telephone industry. From even a cursory review of that material, it is obvious that the FCC has both the statutory authority and the regulatory framework for controlling the opera-

tions of AT&T so as to prevent many of the anticompetitive abuses alleged in the complaint, particularly those relating to rates and interconnection practices.

In actual operation, however, the regulatory ideal of the 1934 Act is far from realization. The volume of tariff filings is simply far too great to permit meaningful review of all of them by the Commission.

During the 12-month period from September 1974 through August 1975, the Commission received 1,371 tariff filings totalling 11,491 pages, and was able to investigate only a small percentage of them. The Commission itself has therefore stated that the tariffs "generally proceed from the carrier's independent judgment." Memorandum of the FCC, filed December 30, 1975, as cited in *United States v. AT&T*, 461 F.Supp. 1314, 1326–27 (D.D.C.1978).

The laxity and lag in the FCC's control over AT&T's tariff practices is particularly evident in the history of the equipment interconnection restrictions challenged here.

For many years, AT&T's tariffs on file with the FCC flatly prohibited subscribers from connecting to the Bell System any apparatus not obtained from one of the Bell companies. In 1956, this restriction was finally invalidated not by the FCC but by the Court of Appeals for the District of Columbia in an action brought by the manufacturer of a mechanical shield adapted to be clipped onto a telephone mouthpiece to provide privacy and reduce noise pickup. *Hush-a-Phone Corp. v. United States*, 99 U.S.App.D.C. 190, 193, 238 F.2d 266, 269 (D.C.Cir.1956), *rev'g* 20 F.C.C. 391 (1955), *on remand*, 22 F.C.C. 112 (1957). The court ruled the restriction unreasonable under Section 201(b) of the 1934 Act as an "unwarranted interference with the telephone subscriber's right reasonably to use his telephone in ways which are privately beneficial without being publicly detrimental."

Disregarding the broad language of the *Hush-a-Phone* ruling and construing it in the narrowest sense as relating only to mechanical attachments, AT&T filed a new tariff which prohibited "direct electrical connection" of any type of device with the telephone lines.

In 1965, an action was brought in the Northern District of Texas by the manufacturer of a device for connection of a base radio station to the telephone lines so that users of two-way mobile radios could communicate through the telephone system, charging that the revised tariff violated the antitrust laws. The court referred the controversy to the FCC for determination in the first instance under the principle of primary jurisdiction. *Carter v. American Telephone & Telegraph Co.*, 250 F.Supp. 188 (N.D.Tex.), *aff'd*, 365 F.2d 486 (5th Cir. 1966), *cert. denied*, 385 U.S. 1008, 87 S.Ct. 714, 17 L.Ed.2d 546 (1967). Thereupon, eleven years after filing of the tariff and only after being prompted by the court reference, the FCC began its first investigation of the legality of the restriction. Once the Commission was prodded into action, however, it took little time to determine that the restriction was unreasonable within the contemplation of Section 201(b) of the Act, and to direct AT&T to file a new tariff permitting the connection of equipment obtained from other sources, where such connection would not adversely affect the performance of the telephone system. *In re Use of the Carterfone Device*, 13 F.C.C.2d 420, *reconsideration denied*, 14 F.C.C.2d 571 (1968). Although the Commission recognized that the integrity of the network was a legitimate concern, it expressly rejected AT&T's contention that such integrity required that only Bell-supplied equipment be electrically connected to the system. It also declined to limit the scope of its ruling to the Carterfone device, because allowing the AT&T tariff to continue in effect with respect to other electrically connected equipment would constitute "a clearly improper burden upon the manufacturers and users of other devices," 13 F.C.C. at 425. It stated that AT&T could prohibit the interconnection of only those devices which actually cause harm to the system and could set up reasonable standards to exclude harmful equipment.

Again disregarding the broad implications of the Commission action, AT&T filed

new tariffs permitting the electrical interconnection of customer-supplied equipment but imposed the requirement that such equipment be connected to the telephone lines only through "protective connecting arrangements" supplied and maintained by AT&T. Objections were filed to these "post-*Carterfone*" tariffs by a number of suppliers of competitive equipment and by the United States; however, the Commission ruled that because the new tariffs did not contravene the express directives of *Carterfone* (since that case involved the interconnection of ancillary equipment rather than "replacement of [a] part of the telephone system"), it would permit the tariffs to become effective pending commission review, emphasizing that "in doing so, we are not giving any specific approval to the revised tariffs." The Commission simultaneously ordered its staff to commence immediately a technical investigation to consider what further changes were necessary in light of a number of unresolved questions. *AT&T "Foreign Attachment" Tariff Revisions*, 15 F.C.C.2d 605, 610–11 (1968), *reconsideration denied*, 18 F.C.C.2d 871 (1969).

This investigation covered the next four years and resulted in a report concluding that the objective of protecting the integrity of the system would be served by permitting the interconnection of customer-supplied equipment meeting technical standards to be specified. The FCC accepted the report and initiated a Notice of Inquiry and Proposed Rule Making. *Proposals for New or Revised Classes of Interstate and Foreign MTS and WATS*, 13 F.C.C.2d 539 (1972). Three years later, on November 7, 1975, the Commission promulgated standards for the registration of equipment that would "provide the necessary minimal protection against network harm." *Proposals for New or Revised Classes of Interstate and Foreign MTS and WATS*, First Report and Order, 56 F.C.C.2d 593, 599 (1975), *on reconsideration*, 57 F.C.C.2d 1216, 58 F.C.C.2d 716, 59 F.C.C.2d 83 (1976). To forestall further evasion of the spirit of its mandate, the FCC ordered AT&T not to require the interposition of an interface device between registered customer-supplied equipment and the telephone system or to "impose other conditions contrary to the *Carterfone* policy without prior approval of the Commission." 56 F.C.C.2d at 599.

This registration system has been in effect since 1975.

*Discussion*

Since the parties do not contend that the Federal Communications Act confers express immunity from the antitrust laws to telephone carriers regulated by the FCC, this case must turn on the applicability of the two types of implied immunity described above: (1) immunity implied because the regulatory scheme established by Congress is so pervasive as to impliedly repeal the operation of the antitrust laws; or (2) immunity implied because the FCC, in accordance with its regulatory mandate, has ruled specifically as to interconnection of customer-supplied equipment in a way which conflicts with the application of antitrust principles to AT&T's filings for the years in question.

*Prior Decisions on Interconnection Restrictions*

The precise issue of implied immunity in connection with AT&T's filing of tariffs requiring AT&T-supplied interface equipment has been addressed recently in several highly persuasive opinions, including *Essential Communications Systems, Inc. v. AT&T, supra* (3d Cir. 1979); *United States v. AT&T*, 461 F.Supp. 1314 (D.D.C.1978, Greene, J.); and *United States v. AT&T*, 427 F.Supp. 57 (D.D.C.1976, Waddy, J.), *petition for cert. denied*, No. 77–1009 (D.C. Cir., filed May 26, 1977), *cert. denied*, 429 U.S. 1071, 97 S.Ct. 824, 50 L.Ed.2d 799 (1977).

Judge Greene's opinion in *United States v. AT&T* and Judge Waddy's earlier opinion in the same case consider the question of antitrust immunity in the context of a broad government challenge to AT&T's conduct of the telephone business, including AT&T's resistance to the entry of other, specialized carriers into the telecommunications service market, as well as AT&T's

efforts to reduce or eliminate competition in the provision of ancillary telephone equipment. In that broad context, Judge Greene held (1) that the wording of the Federal Communications Act, the "relatively weak" regulatory power of the FCC to supervise telephone tariffs, and the practical inability of the FCC to scrutinize all the tariffs submitted to it indicated that, in the areas described, FCC regulation was not "pervasive" within the meaning of *Gordon, supra,* or *Otter Tail, supra,* see 461 F.Supp. at 1326; and (2) that the FCC's failure specifically to approve the tariffs involved, and the Court's finding that the business practices contained in the tariffs were included as a result of AT&T's business judgment, rather than regulatory coercion or approval, indicated that no specific conflict existed between the FCC's exercise of its regulatory authority and the application of antitrust scrutiny to AT&T's alleged anticompetitive actions, including its interface device requirement and its predatory marketing practices. Judge Greene stated:

"There is absolutely nothing to suggest that Congress expected the Commission to require or approve, or that the Commission did require or approve any of those practices. These activities not only violate the antitrust laws but they are also inconsistent with the very purposes of the regulation, or at the very least they are not required or encouraged either by the regulatory theory or by regulatory action. 461 F.Supp. at 1328.

Judge Waddy similarly found that no broad implied repeal of the antitrust laws covered AT&T's alleged activities in the government suit. 427 F.Supp. at 61.

In *Essential, supra,* a case specifically challenging the AT&T interface equipment requirement, the Court of Appeals for the Third Circuit, after tracing the history of the 1934 Act and of AT&T's tariff practices thereunder, found that AT&T's filing of and adherence to its tariff under § 205 was not immune to antitrust attack by *suppliers* of equipment (since any FCC regulatory approval under § 205 would be for the benefit of *customers* under the nondiscrimination goal of the statute, so that the "filed tariff" doctrine of *Keogh, supra,* would bar damages recovery by those customers only). *Id.* at 1123–1124. Moreover, the Third Circuit found that no conflict existed between the FCC's actions and application of the antitrust laws because

"[t]he FCC never approved the 1968–1975 tariff. Instead of holding a hearing immediately after the filing as permitted by the Act, the FCC told AT&T to file a tariff subject to later approval or disapproval in accordance with certain independent studies commissioned by the agency. In effect, the FCC suspended its judgment pending further study. We do not feel that this course of conduct rises to the level of agency approval that might require implied immunity. Postponement of action by the agency cannot be construed as approval requiring a court to refrain from enforcing the antitrust laws, especially where, as here, the agency ultimately declared defendant's interim conduct improper. Thus we find no basis for the conclusion that the enforcement of section 4 of Clayton Act in the form of money damages would present a conflict with the policies of the 1934 Act." At 1124.

Significantly, this decision reversed the judgment of the District Court dismissing the complaint on the ground of implied immunity, *Essential Communications Systems, Inc. v. AT&T,* 446 F.Supp. 1090 (D.N. J.1978), a decision heavily relied upon by Magistrate Sinclair in his Recommended Decision.

In a number of other recent decisions, the Courts have likewise found no implied immunity in connection with AT&T's interface device requirement. *Sound, Inc. v. AT&T,* Civ.No. 76–186–2 (S.D.Iowa, September 27, 1979); *Jarvis, Inc. v. AT&T,* 487 F.Supp. 120 (D.D.C.1978, Robinson, J.); *Interconnect Planning Corp. v. AT&T,* 465 F.Supp. 811 (S.D.N.Y.1978); *Northeastern Telephone Co. v. AT&T,* 1979–1 Trade Cases 77,171 (D.Conn.1978).

In addition to all these cases involving the interface device requirement, the courts

in three other cases have considered the question of implied antitrust immunity in the closely similar context of AT&T's refusal to interconnect with other communications carriers, and in all three have ruled that there was no implied immunity. *MCI Communications Corp. v. AT&T*, 462 F.Supp. 1072 (N.D.Ill.1978) (interconnection with microwave transmission link between Chicago and St. Louis); *Woodlands Telecommunications Corp. v. AT&T*, 447 F.Supp. 1261 (S.D.Tex.1978) (interconnection with local telephone system in new community development near Houston); *Southern Pacific Communications Co. v. AT&T*, civil action 78–0545 (D.D.C. July 2, 1979) (interconnection with intercity business telecommunications system). The opinions in these three carrier-interconnection cases, and particularly that of Judge Grady in MCI, are also highly persuasive.

In *MCI*, Judge Grady, after a detailed analysis of the court decisions finding implied antitrust immunity in other administrative settings, and a thorough review of the legislative and administrative history of the 1934 Act, concluded that the FCC lacked the ability to grant relief for the types of anticompetitive activity allegedly engaged in by AT&T in that case (and here).

"Unlike the statute analyzed in *Pan Am*, the Federal Communications Act does not have a section authorizing the FCC to grant relief from the variegated conduct included within the concept of 'unfair competition.'" *Id.* at 1086.

"* * * Throughout the hearings, the Committee members assumed that the Sherman Act and the state antitrust laws would continue to apply to abuses arising from the existing, unaffected competition between telephone companies.

[citing Hearings on S.1313 before the Joint Committee on Interstate Commerce, 67th Cong., 1st Sess. 17 at 26–27].

"Therefore, nothing in the statute itself or its legislative history leads to the conclusion that the FCC has exclusive jurisdiction to remedy acts of unfair competition such as customer interference, false advertising, or trade disparagement.

"Equally important, FCC proceedings do not provide the relief which MCI seeks. In its complaint, MCI prays for treble the damages its business sustained by reason of AT&T's exclusionary practices and for an injunction against AT&T's commission of future predatory acts." *Id.* at 1087.

"* * * we must conclude that plaintiff's remedy for the acts of unfair competition alleged in the complaint is not adequate because Sections 206–209 do not provide for treble damages, do not compensate competitive injury, and only provide for piecemeal consideration of allegedly predatory acts." *Id.* at 1088.

There are two decisions reaching the contrary conclusion that there is implied immunity in connection with AT&T's interface-device requirement, both by the same district court for the Central District of California: *Phonotele, Inc. v. AT&T*, 435 F.Supp. 207 (C.D.Calif.1977, Gray, J.); *Monitor Business Machines, Inc. v. AT&T*, 1978–1 Trade Cases 74,444 (C.D.Calif.1978, Williams, J.).

The force of these two decisions is somewhat weakened by their reliance on an earlier decision of the same court in *Dasa Corp. v. General Telephone Co. of California*, 1977–7 Trade Cases 72,536 (C.D.Calif.1977, Lydick, J.). In *Dasa*, the court considered the issue of implied antitrust immunity in the context of an alleged conspiracy between General Telephone Co. of California and the supplier to it of a "divert-a-call" device which automatically switches an incoming call from one telephone number to another. In a brief, 1½-page opinion, containing little by way of analysis, the court ruled that there was implied immunity, expressly basing that decision upon its conclusion that the ruling of the Fourth Circuit in *North Carolina Utilities Commission v. FCC*, 537 F.2d 787 (4th Cir. 1976), *cert. denied*, 429 U.S. 1027, 97 S.Ct. 651, 50 L.Ed.2d 631 (1976), was "controlling." That conclusion is difficult to understand. All that the *North Carolina* decision ruled was

that the FCC had "primary authority" to order the interconnection of customer-supplied terminal equipment with the national telephone network, despite tariffs filed with and approved by State regulatory agencies prohibiting such interconnection with "intrastate" facilities. The Court did not rule that the FCC's authority to disapprove tariffs immunized from antitrust attack all activities associated with their filing. Indeed, the issue of antitrust immunity was neither involved nor discussed.

*Phonotele, supra,* was the only one of the opinions finding implied immunity which contained any substantial analysis of the factors giving rise to the implication of immunity. Judge Gray did not merely rely on Judge Lydick's decision in *Dasa,* but also found that four of the five factors listed in the Yale Law Journal note cited hereinabove were present: that the activities charged as antitrust violations involve the "precise ingredients" of the FCC's regulatory authority; that the FCC has authority to grant the relief sought there (an injunction and damages); that competition is a component of the "public interest" standard which guides the FCC's regulatory decision; and that the FCC has considerable expertise in the field. However, Judge Gray did not discuss, nor apparently consider, how the regulatory scheme, so fine in concept, had actually worked in practice.

*Monitor, supra,* was another very brief opinion, less than 2 pages in length, containing scant analysis but relying principally on the prior decisions of Judges Lydick and Gray in *Dasa* and *Phonotele.*

The weight of authority in cases involving the issue of antitrust immunity in connection with the filing of restrictive tariffs with the FCC thus overwhelmingly favors the conclusion that no such immunity exists.

*Other Decisions on Implied Immunity*

The Recommended Decision, and the defendants in supporting it, rely heavily upon the Supreme Court decisions finding implied immunity in the areas of airlines and securities regulation. These decisions were considered at length in the aforementioned cases involving communications regulation and found not to be controlling in the latter environment, because of differences in the statutory schemes and in the actual degree of administrative oversight.

In *Pan Am, supra,* the government charged that Pan Am had violated the antitrust laws by effectively allocating territories between itself and its subsidiary, Panagra, for example, by preventing Panagra from filing with the Civil Aeronautics Board ("CAB") a petition for a route extension from the Canal Zone to the United States. The Supreme Court found that Section 411 of the Civil Aeronautics Act of 1938, 49 U.S.C. § 1381, granted the CAB express authority to investigate complaints of unfair methods of competition and, employing a "public interest" standard which expressly required the CAB to consider the effects on competition, to issue cease and desist orders. The Court therefore concluded that the 1938 Act gave the CAB power to grant the only relief sought—divestiture of Panagra—and that antitrust immunity should therefore be implied:

> " * * * where the problem lies within the purview of the Board, as do questions of divisions of territories, the allocation of routes, and the affiliation of common carriers with air carriers, Congress must have intended to give it authority that was ample to deal with the evil at hand." 371 U.S. at 312, 83 S.Ct. at 486.

The ruling was expressly confined to the specific abuses charged in that case and was based on the CAB's exclusive jurisdiction to remedy them:

> "We think the narrow questions presented by this complaint have been entrusted to the Board and that the complaint should have been dismissed." *Id.* at 313, 83 S.Ct. at 486.

In *Hughes Tool, supra,* TWA charged that Hughes Tool's control over TWA's acquisition and financing of aircraft, through Hughes Tool's ownership of 45% of TWA's common stock, violated the antitrust laws. Hughes Tool moved for dismissal on the ground that the CAB had specifically ap-

proved its acquisition of the stock, so that antitrust immunity should be implied under the principle of *Pan Am.* Again the Court made an expressly limited ruling:

" * * * [T]he authority of the Board to grant the power to 'control' and to investigate and alter the manner in which that 'control' is exercised leads us to conclude that this phase of CAB jurisdiction, like the one in the *Pan American* case, pre-empts the antitrust field. 409 U.S. at 385, 93 S.Ct. at 660.

\* \* \* \* \* \*

"We repeat, however, what we said in the *Pan American* case that the Federal Aviation Act does not completely displace the antitrust laws.

'While the Board is empowered to deal with numerous aspects of what are normally thought to be antitrust problems, those expressly entrusted to it encompass only a small fraction of the total.' 371 U.S. at 305 [83 S.Ct. at 482.]" *Id.* at 387, 93 S.Ct. at 661.

In his dissenting opinion in *NASD,* Justice White, joined by three other justices, again emphasized the limited applicability of *Hughes Tool,* stating that it "involved acts and transactions expressly immunized from antitrust scrutiny." 422 U.S. at 737, 95 S.Ct. at 2451.

In *Gordon, supra,* a class of small investors sued the New York Stock Exchange ("the Exchange") and two of its member firms for alleged violation of the Sherman Act by the system of fixed commission rates established by the Exchange for transactions of less than $500,000. The Supreme Court ruled that a provision of the Securities Exchange Act of 1934 permitting the Securities Exchange Commission ("SEC") to approve or disapprove commission rates conferred implied antitrust immunity. The Court found a demonstrable Congressional intent to leave the obviously anticompetitive practice of commission-fixing to Exchange self-regulation, subject to SEC approval, 422 U.S. at 667, 95 S.Ct. at 2604, and further that, in actual practice, the SEC had so closely supervised the Exchange's commission rate practices as to

have effectively sanctioned them. *Id.* at 689, 95 S.Ct. at 2605.

Two separate concurring opinions emphasized the narrow bounds of the Court's ruling. Justice Douglas wrote:

"The mere existence of a statutory power of review by the SEC over fixed commission rates cannot justify immunizing those rates from antitrust challenges. * * *. Only if the SEC is actively and aggressively exercising its power of review can we be sure that fixed commission rates are being monitored in the manner which Congress intended." *Id.* at 691–92, 95 S.Ct. at 2616.

And Justice Stewart, joined by Justice Brennan, added:

"The Court has never held, and does not hold today, that the antitrust laws are inapplicable to anticompetitive conduct simply because a federal agency has jurisdiction over the activities of one or more of the defendants. An implied repeal of the antitrust laws may be found only if there exists a 'plain repugnancy between the antitrust and regulatory provisions.' *United States v. Philadelphia Nat. Bank,* 374 U.S. 321 [83 S.Ct. 1715, 10 L.Ed.2d 915]." *Id.* at 692, 95 S.Ct. at 2616.

In the present case, by contrast, there was no evident congressional design that AT&T would act as a self-regulator. Moreover, as previously discussed, the FCC's supervision over AT&T's activities has been far from tight. Finally, the only time the FCC ruled on the interface device requirement challenged here, it found it to be unreasonable and illegal; the SEC had for many years expressly approved the fixing of commission rates and had strongly resisted opening them up to competition.

*NASD, supra,* was an antitrust action by the government against the National Association of Securities Dealers ("NASD") and certain of its member firms, based on their agreement limiting sale of mutual fund shares except by issuers, underwriters and contract dealers, at the offering price described in the prospectus, thus preventing the development of a secondary dealer market.

The defendants moved for dismissal on the ground that Sections 22(d) and (f) of the Investment Company Act of 1940, 15 U.S.C. § 80a–22(d) and (f), either required or authorized such restrictions and that the Maloney Amendment to the Securities Exchange Act of 1934, 15 U.S.C. § 78o–3, provides a system of self-regulation by the registered voluntary associations, such as the NASD.

In a decision filed the same day as *Gordon*, a five-to-four majority of the Court found that:

"The Commission-sponsored provision authorized the SEC to promulgate rules, regulations and orders prohibiting restrictions on the transferability or negotiability of mutual-fund shares, S.3580, § 22(d)(2), 76th Cong., 3d Sess. (1940). Commission testimony indicates that it considered this authority necessary to allow regulatory control of industry measures designed to deal with the disruptive effects of 'bootleg market' trading and with other detrimental trading practices identified in the Investment Trust Study." 422 U.S. at 722, 95 S.Ct. at 2444.

" * * * the statute reflects a clear congressional determination that, subject to Commission oversight, mutual funds should be allowed to retain the initiative in dealing with the potentially adverse effects of disruptive trading practices.

"The Commission repeatedly has recognized the role of private agreements in the control of trading practices in the mutual-fund industry." 422 U.S. at 727, 95 S.Ct. at 2446.

Despite the obvious anticompetitive effect of these agreements, the Court recognized that

" * * * Congress has made a judgment that these restrictions on competition might be necessitated by the unique problems of the mutual fund industry, and has vested in the SEC final authority to determine whether and to what extent they should be tolerated 'in the interest of the holders of all outstanding securities' of mutual funds. 15 U.S.C. § 80a–22(f)." *Id.* at 729, 95 S.Ct. at 2447.

The Court emphasized that the SEC had discharged its statutory responsibility by continually monitoring the challenged practices of the NASD and "repeatedly has recognized the role of private agreements in the control of trading practices in the mutual fund industry." *Id.* at 727, 95 S.Ct. at 2447. More specifically, the Court noted that the SEC had reviewed the particular *NASD* rule in question, and had expressly recognized its power to control such restrictions under Section 22(f). *National Association of Securities Dealers, Inc.*, 9 S.E.C. 38, 44–45 and n.10 (1944). The Court added:

" * * * this contemporaneous interpretation by the responsible agency is entitled to considerable weight." *Id.* at 725, 95 S.Ct. at 2445.

In that connection, it was doubtless of some significance in *NASD* that the SEC filed an *amicus curiae* brief arguing that the complaint should be dismissed on the ground of implied immunity.

In the situation at bar, by contrast, the FCC filed in the government antitrust case, and the government filed in *Essential, amicus curiae* briefs contending that the FCC's regulation of the activities of AT&T was not such as to create implied antitrust immunity with respect to the tariffs here in question.

*Summary*

■ There is nothing in the 1934 Act or in its legislative history which suggests that Congress intended that the regulation of communications carriers by the FCC would exempt from the antitrust laws all of the activities of such carriers relating to the regulated business. Quite the contrary, the Act specifically provides that nothing contained in it "shall in any way abridge or alter" statutory or common law remedies. 47 U.S.C. § 414 (1976). And the fact that the Act contains a specific provision granting antitrust exemption for mergers approved by the FCC, 47 U.S.C. § 221(a) (1970), clearly indicates that Congress contemplated no general exemption.

Moreover, the FCC itself has construed the Act as leaving undisturbed the jurisdic-

tion of the courts over antitrust controversies arising out of activities which it has neither required nor approved. The FCC has expressly recognized that its control over the activities of communications carriers, unlike that exercised by the CAB and the SEC over the airlines and the securities markets, leaves the carriers a considerable degree of control over their own operations.

AT&T formulates its own tariffs, based on its independent business judgment. From the history of the tariffs involved here, it would appear at least possible for a jury to infer that AT&T has not always been motivated exclusively by an altruistic concern for the public interest, and even that some of its actions have instead been influenced by an obsessive abhorrence of competition.

The FCC's admitted inability to review most of the tariffs filed with it, and the long delays experienced in determining the reasonableness of those it does examine, have created an obviously tempting opportunity for AT&T to obliterate competition for long periods simply by filing tariffs containing restrictions on competition even though they are foredoomed ultimately to be struck down. For example, by the time the interface device requirement was finally supplanted by the registration system in 1975, Litton's BTS subsidiary had failed and was on its way out of business.

The interface device requirement would seem difficult to justify as necessary to insure the integrity of the telephone network. If AT&T could provide telephone terminal equipment capable of being connected directly to the telephone lines without an interface device and without injury to the system, there is no apparent reason why other technically qualified manufacturers, including Litton, could not do so as well. It would seem to have been obvious from the outset that the system could be adequately protected by establishing specifications as to impedance loading and other electrical effects of interconnection with the terminal equipment, which is just what the FCC ultimately determined.

The complaint charges, in effect, that AT&T (knowing that the tariffs would probably remain in effect for a number of years at least) included the interface device requirement in bad faith, then deliberately delayed the FCC's consideration of the reasonableness of the restriction and supplied false and misleading information to the FCC in connection therewith and, during the seven years the restriction remained in effect before the FCC finally declared it unreasonable, intentionally designed the interface equipment so as to degrade the audio quality of the signals, charged exorbitant prices for the interface equipment and deliberately delayed its production, installation and servicing, as well as falsely disparaging competitive terminal equipment which was in fact superior to the Bell equipment, and bribing the officials of state agencies to deny fair access and hearing to AT&T's competitors.

Whether plaintiff can prove these allegations remains to be seen. But, for purposes of testing the legal sufficiency of the complaint as against the challenge of implied immunity, the allegations must be accepted as true. *California Motor Transport, supra* at 515–16, 92 S.Ct. at 614.

What the complaint charges, in effect, is a calculated subversion of the regulatory scheme. The system of administrative supervision is not undercut but is complemented and reinforced by affording judicial relief for cynical evasion or corruption of that system for unfair competitive advantage. As Judge Grady stated in *MCI*, "even the most pervasive scheme of regulation cannot immunize someone from anticompetitive sham activity which seeks to abuse the regulatory process itself." 462 F.Supp. at 1098. See also *United States v. AT&T, supra*, 461 F.Supp. at 1328–29 (citing *Georgia v. Pennsylvania R.R., supra*).

There is no "plain repugnancy" between the FCC's authority to approve AT&T's tariffs and the court's authority to provide a remedy to competitors who are injured by tariffs which are filed in bad faith and are ultimately disapproved, as well as by other acts of unfair competition not within the

FCC's traditional area of responsibility. Repeal of the antitrust laws is not "necessary to make the [regulatory scheme] work."

■ The Court concludes that no implied immunity from the antitrust laws exists for the activities of AT&T alleged in the complaint.

### NOERR–PENNINGTON IMMUNITY

■ Defendants have also urged that such of their allegedly improper activities as were intended to influence governmental action are protected by the First Amendment under the doctrine of the *Noerr* and *Pennington* cases, *supra*. This contention need not occupy us long.

In *Noerr*, an association of trucking companies charged that a group of railroads, aided by a public relations firm, had conducted a massive campaign of deceptive publicity designed to foster legislation harmful to the truckers and to impair their relations with their customers. The Supreme Court after a review of the entire record, concluded that the publicity campaign was motivated by the railroads' efforts to influence legislation and that the injury sustained by the truckers was merely "incidental." The Court ruled that "no violation of the [Sherman] Act can be predicated upon mere attempts to influence the passage or enforcement of laws." 365 U.S. at 135, 81 S.Ct. at 528. The Court explained:

> "In a representative democracy such as this, these [Legislative and Executive] branches of government act on behalf of the people and, to a very large extent, the whole concept of representation depends upon the ability of the people to make their wishes known to their representatives. To hold that the government retains the power to act in this representative capacity and yet hold, at the same time, that the people cannot freely inform the government of their wishes would impute to the Sherman Act a purpose to regulate, not business activity, but political activity, a purpose which would have no basis whatever in the leg-

islative history of that Act." *Id.* at 137, 81 S.Ct. at 529.

\* \* \* \* \* \*

> "The right of petition is one of the freedoms protected by the Bill of Rights, and we cannot, of course, lightly impute to Congress an intent to invade these freedoms." *Id.* at 138, 81 S.Ct. at 530.

However, the Court cautioned:

> "[t]here may be situations in which a publicity campaign, ostensibly directed toward influencing governmental action, is a mere sham to cover what is actually nothing more than an attempt to interfere directly with the business relationships of a competitor and the application of the Sherman Act would be justified." *Id.* at 144, 81 S.Ct. at 533.

In *Pennington*, a small coal company alleged that the United Mine Workers' Union and certain large coal companies had conspired to influence the Secretary of Labor to prescribe higher minimum wages and thereby squeeze it and other small operators out of business. The Supreme Court ruled:

> "*Noerr* shields from the Sherman Act a concerted effort to influence public officials regardless of intent or purpose. \* \* Joint efforts to influence public officials do not violate the antitrust laws even though intended to eliminate competition. Such conduct is not illegal, either standing alone or as part of a broader scheme itself violative of the Sherman Act." 381 U.S. at 670, 85 S.Ct. at 1593.

The *Noerr* opinion's suggestion that no immunity would exist for "sham" efforts to influence governmental action which were actually intended to injure competitors found practical application in *California Motor Transport, supra*. In that case, one group of highway carriers sued another, alleging that the defendants had conspired to put the plaintiffs out of business by instituting groundless state and federal proceedings to delay and defeat plaintiffs' applications to acquire and transfer operating rights, thereby depriving plaintiffs of free and unlimited access to the regulatory

agencies. The Supreme Court ruled that the District Court erred in dismissing the complaint for failure to state a cause of action, remarking:

> "It is well settled that First Amendment rights are not immunized from regulation when they are used as an integral part of conduct which violates a valid statute * * *. 404 U.S. at 514, 92 S.Ct. at 613. "First Amendment rights may not be used as the means or the pretext for achieving 'substantive evils' * * * which the legislature has the power to control. * * * If the end result is unlawful, it matters not that the means used in violation may be lawful." *Id.* at 515, 92 S.Ct. at 614.

Likewise, in *Woods Exploration & Production Co. v. Aluminum Co. of America*, 438 F.2d 1286 (5th Cir. 1971), *cert. denied*, 404 U.S. 1047, 92 S.Ct. 701, 30 L.Ed.2d 736 (1972), the Fifth Circuit court ruled that the filing of false natural gas production forecasts for the purpose of influencing the Texas Railroad Commission to reduce plaintiffs' production allowances was an "abuse of the administrative process" which "does not justify antitrust immunity." 438 F.2d at 1298.

Magistrate Sinclair concluded, and this Court agrees, that the activities of defendants alleged in the complaint would, if proven, constitute such abuse of the administrative process as to come within the "sham" exception to the *Noerr-Pennington* doctrine. This doctrine, therefore, provides no basis upon which defendant's motion for summary judgment could be granted.

### STATE ACTION

Defendants further contend that the tariffs challenged here were filed at the direction of the FCC and the responsible state regulatory agencies and are therefore immune from antitrust attack under the "state action" doctrine enunciated in *Parker v. Brown, supra.* That contention likewise merits only brief discussion.

*Parker v. Brown* was an antitrust action seeking an injunction against enforcement of the provisions of the California Agricul-tural Prorate Act which restricted competition among raisin growers to prevent destructive price cutting. The Supreme Court ruled:

> "nothing in the language of the Sherman Act or in its history * * * suggests that its purpose was to restrain a state or its officers or agents from activities directed by its legislature. 317 U.S. at 350–51, 63 S.Ct. at 313. "* * * The state * * * as sovereign, imposed the restraint as an act of government which the Sherman Act did not undertake to prohibit." *Id.* at 352, 63 S.Ct. at 314.

In *Jeffrey v. Southwestern Bell*, 518 F.2d 1129 (5th Cir. 1975), the "state action" doctrine was applied to exempt from antitrust attack the activities of Bell's Southwestern regional operating company in filing with the Dallas City Council tariffs setting rates for telephone services within the city. The court stated:

> "Regulation by a governmental body of the rates to be charged by a public utility are a classic example of the *Parker v. Brown* exemption." 518 F.2d at 1134.

However, the Supreme Court has repeatedly emphasized that the "state action" exemption extends only to actions which are not merely at the instance of the state government, but which are specifically compelled by it.

For example, in *Goldfarb v. Virginia State Bar*, 421 U.S. 773, 95 S.Ct. 2004, 44 L.Ed.2d 572 (1975), the Court considered "whether a minimum-fee schedule for lawyers published by the Fairfax County Bar Association and enforced by the Virginia State Bar" violated the Sherman Act. 421 U.S. at 775, 95 S.Ct. at 2007. The defendants claimed "state action" immunity, contending that the Virginia State Bar was "a state agency by law." *Id.* at 790, 95 S.Ct. at 2014. The Court concluded:

> "It is not enough that * * * anticompetitive conduct is 'prompted' by state action; rather anticompetitive activities must be compelled by direction of the State acting as a sovereign." *Id.* at 791, 95 S.Ct. at 2015.

To the same effect is the Court's earlier decision in *Continental Ore Co. v. Union Carbide*, 370 U.S. 690, 706–07, 82 S.Ct. 1404, 1414, 8 L.Ed.2d 777 (1962).

And in *Cantor v. Detroit Edison Co.*, 428 U.S. 579, 96 S.Ct. 3110, 49 L.Ed.2d 1141 (1976), the Court ruled that, even though the defendant utility was subjected to pervasive regulation by the Michigan Public Service Commission, which had specifically approved its tariff providing that the utility would replace for its customers free of charge their burned-out light bulbs, this practice was not immune from antitrust attack. The Court explained:

"Respondent could not maintain the lamp-exchange program without the approval of the Commission, and now may not abandon it without such approval. Nevertheless, there can be no doubt that the option to have, or not to have, such a program is primarily respondent's, not the Commission's." *Id.* at 594, 96 S.Ct. at 3119.

Likewise, in the present case, although the tariffs in question were filed at the direction of federal, state or local regulatory agencies, and could not be changed without agency approval, the idea of preventing the interconnection of customer-supplied terminal equipment without a Bell-supplied interface device originated with AT&T. Moreover, unlike the tariff in *Cantor*, the interface device requirement was never specifically approved and was ultimately found by the FCC to be unreasonable and illegal.

By no stretch of meaning can the inter-face-device requirement be deemed to have been "compelled" by the regulatory agencies, even though the filing of *some* tariff was. The "State Action" doctrine accordingly does not shield defendants' actions from the reach of the antitrust laws.

### PRIMARY JURISDICTION

[7] The Court rejects Magistrate Sinclair's alternative recommendation, that this action should be stayed pending determination of the issues in the first instance by the FCC under the principle of primary jurisdiction.

In *United States v. R.C.A., supra*, the Court explained the rationale underlying the principle:

"The doctrine originated with Mr. Justice (later Chief Justice) White in *Texas & Pacific R. Co. v. Abilene Cotton Oil Co.*, 204 U.S. 426, [27 S.Ct. 350, 51 L.Ed. 553]. It was grounded on the necessity for administrative uniformity, and, in that particular case, for maintenance of uniform rates to all shippers. A second reason for the doctrine was suggested by Mr. Justice Brandeis in *Great Northern R. Co. v. Merchants Elevator Co.*, 259 U.S. 285, 291 [42 S.Ct. 477, 66 L.Ed. 943] where he pointed to the need for administrative skill 'commonly to be found only in a body of experts' in handling the 'intricate facts' of, in that case, the transportation industry." 358 U.S. at 346, 79 S.Ct. at 464 (footnote omitted).

The expressed basis for Magistrate Sinclair's recommendation that the principle be applied in this case is that the FCC has "special expertise, a vast compendium of knowledge" (p. 242) in the relevant areas, and "[i]n order to preserve the regulatory scheme, the agency should be given the opportunity to interpret its own rules and regulations" (p. 244), thereby reducing the possibility of inconsistent results among the "welter" of cases presenting the same issues.

The Court concludes that this case is not a proper one for referral to the FCC for the reason that the FCC has already employed its expertise in deciding the principal issue with respect to which that expertise was needed: whether the interface device requirement was fair and reasonable.

The only other issues with respect to which the FCC's special expertise might be advantageous are (1) whether the data supplied to the FCC, in an attempt to justify the interface device requirement, were false and misleading; and (2) whether the Bell terminal equipment was predatorily underpriced.

However, neither of these issues is beyond the understanding of laymen. More-

over, there is no assurance that the FCC would choose to resolve the issues nor, if they did, any way of predicting how long it would take. Based on experience with the post-*Carterfone* tariffs, it appears unlikely that the FCC would reach a decision for several years at least. The present case has already been pending for over three and one-half years, during which time intensive trial preparations have been pursued so that the case is almost ready for trial. Any further substantial delay would disserve the interests of justice.

Insofar as concerns the possibility of conflicting results, defendants have achieved no apparent success in persuading any of the other courts to refer the issues to the FCC. It thus appears that, even if this Court should make such a reference, the possibility of inconsistent results will still exist.

Finally, there is one problem which is not addressed by any of the parties in their briefs, nor treated in any of the decisions they have cited: plaintiffs have demanded a jury trial of all the issues. If the FCC's findings are treated as preclusive, or even if they are admissible in evidence, it appears that substantial Seventh Amendment questions will be raised.

The Court concludes that, on balance, the advantages of referral to the FCC are outweighed by the disadvantages.

### CONCLUSION

Defendants' motion is denied in its entirety, and defendants' request for certification of the question to the Court of Appeals under 28 U.S.C. § 1292(b) is also denied.

SO ORDERED.