750 F.2d 1154
 1985-1 Trade Cases 66,328
 CAPITAL TELEPHONE COMPANY, INC., Peter A. Bakal, Tri-Cities
Telephone Company, Inc., and Capital District
Answering Service, Inc., Plaintiffs-Appellants,
v.
NEW YORK TELEPHONE COMPANY, Defendant-Appellee.
 No. 7, Docket 84-7176.
 United States Court of Appeals,
Second Circuit.
 Argued Aug. 31, 1984.
Decided Dec. 18, 1984.
 
 Keith J. Roland, Albany, N.Y. (Emilio A.F. Petroccione, Roland & Fogel, Albany, N.Y., of counsel), for plaintiffs-appellants.
 Walter C. Reid, New York City (John M. Clarke, Gerald E. Murray, New York City, of counsel), for defendant-appellee.
 Before KAUFMAN, MESKILL and PIERCE, Circuit Judges.
 MESKILL, Circuit Judge:
 
 
 1
 This is an appeal from a judgment entered in the United States District Court for the Northern District of New York, Foley, J., granting defendant's motion for judgment on the pleadings and dismissing plaintiffs' claims. Because we conclude that defendant's actions are protected from antitrust liability by state action immunity according to the standards set forth by the Supreme Court in California Retail Liquor Dealers Ass'n v. Midcal Aluminum, Inc., 445 U.S. 97, 100 S.Ct. 937, 63 L.Ed.2d 233 (1980), we affirm.
 
 BACKGROUND
 A. Facts
 
 2
 The plaintiffs are a number of Radio Common Carriers (RCCs) or Radio Telephone Utilities (RTUs) which provide radio-telephone and paging services in upstate New York. Capital Telephone Company, Inc. (Capital) and Peter A. Bakal (Bakal), both RCCs, offer one-way paging and two-way mobile radio services in Albany, Schenectady and Troy, New York. Tri-Cities Telephone Co., Inc. (Tri-Cities or Tri-City)[1] provides two-way marine mobile radio services on the Hudson and Mohawk Rivers and Lake George, New York. Capital District Answering Service, Inc. (Capital District) offers telephone answering services in the Albany region. Plaintiffs Capital, Bakal and Tri-Cities are subject to the jurisdiction of the Federal Communications Commission (FCC) and the Public Service Commission of the State of New York (PSC). See 47 U.S.C. Sec. 151 et seq.; N.Y.Pub.Serv.Law Secs. 90-101-a. Capital District is unregulated. All four plaintiff companies are owned and operated by Peter A. Bakal.
 
 
 3
 Defendant New York Telephone Company (N.Y. Tel.) is a corporation organized under the laws of the State of New York. As a "telephone corporation," N.Y.Pub.Serv.Law Sec. 2(17), N.Y. Tel. is regulated by the PSC, N.Y.Pub.Serv.Law Sec. 94.2, as well as by the FCC, 47 U.S.C. Secs. 201-24.
 
 
 4
 The history of this conflict is a long one. Throughout a variety of administrative and judicial actions, detailed below, plaintiffs have charged that N.Y. Tel. has discriminated against them by performing a number of anti-competitive acts. Among plaintiffs' specific allegations are that they are charged for incoming and outgoing circuits and for circuit installations while their competitors are not; that plaintiffs are charged for radio tie lines, paging numbers and mobile numbers while their competitors are not; that their competitors receive free outpulsing and phone book listings while plaintiffs must pay; and that plaintiffs have no toll call investigation or credit card services while their competitors do receive these services. Ex. D, Plaintiffs' Partial Responses to Defendant's First Set of Interrogatories, J.App. at 154.
 
 B. Prior Proceedings
 
 5
 Capital and Bakal were granted certificates of public convenience by the PSC in 1962 and 1963 respectively. The record indicates that the administrative and judicial action concerning the dispute between the RCCs and N.Y. Tel. began in 1968 and has continued through the intervening years. The details of these actions are set out in the margin.[2]
 
 
 6
 In July 1982, after the FCC dismissed their complaint, the RCCs filed this action with the district court. Plaintiffs alleged that the activities on which their prior complaints had been based constitute violations of Sections 1 and 2 of the Sherman Act, 15 U.S.C. Secs. 1, 2 and of Section 2 of the Clayton Act, 15 U.S.C. Sec. 13.
 
 C. District Court Decision
 
 7
 Defendant moved for judgment on the pleadings under Fed.R.Civ.P. 12(c), claiming that its actions are immune from antitrust liability under the state action exemption. After determining that state action immunity is available to private parties, Capital Telephone Co., Inc. v. New York Telephone Co., No. 82-CV-789 (N.D.N.Y. Jan. 24, 1984), J.App. at 436, the court applied the facts of this case to the Supreme Court's two part test in California Retail Liquor Dealers Ass'n v. Midcal Aluminum, Inc., 445 U.S. 97, 100 S.Ct. 937, 63 L.Ed.2d 233 (1980) (Midcal ). Although in Midcal the Court considered the threshold question of whether there was a violation of the Sherman Act, see infra, the district court did not address this issue below. Because the question was not considered, we will assume for purposes of our analysis that violations of federal antitrust laws are present.
 
 
 8
 The court determined that New York's Public Service Law and decisions of the state courts demonstrated that the state's "policy ... articulates and expresses a clear intent to displace unfettered competition with regulated market activity," J.App. at 442, thus satisfying the first part of the test; see also Midcal, 445 U.S. at 105, 100 S.Ct. at 943. The court also believed that the Public Service Law demonstrated the "active supervision" exercised by the state over telephone corporations. J.App. at 443. Therefore, the court concluded that both requirements for state action immunity had been fulfilled. J.App. at 442-43. Because the court found the state action immunity issue dispositive, it did not consider N.Y. Tel.'s additional claims of defenses under theories of implied immunity, primary jurisdiction and the filed tariff doctrine. The court granted the defendant's Fed.R.Civ.P. 12(c) motion. Id. at 445. Plaintiffs filed Notice of Appeal with this Court on February 14, 1984. J.App. at 447.
 
 DISCUSSION
 A. State Action Immunity
 1. Development of Standard
 
 9
 The antitrust laws represent a national policy favoring competition. Midcal, 445 U.S. at 110-11, 100 S.Ct. at 945-46. In certain situations that policy is set aside to permit states to exercise control of competition through regulation. Where challenged actions are taken pursuant to a state's legislative determination to displace competition with regulation, a court considering antitrust claims will not interfere with the state's decision. This "state action immunity" from antitrust liability, first recognized in Olsen v. Smith, 195 U.S. 332, 344-45, 25 S.Ct. 52, 55, 49 L.Ed. 224 (1904), was fully explained by the Supreme Court in Parker v. Brown, 317 U.S. 341, 63 S.Ct. 307, 87 L.Ed. 315 (1943). In Parker the Court held that California's Agricultural Prorate Act did not violate the Sherman Act. Id. at 352, 63 S.Ct. at 314. The Prorate Act provided for the institution of prorate marketing programs for agricultural commodities in order to "conserve the agricultural wealth of the State" and "prevent economic waste." Id. at 346, 63 S.Ct. at 311. The program designed for the raisin industry allowed producers to sell only thirty percent of their crops on the open market. Of the remainder, fifty percent was to be placed into a stabilization pool and twenty percent into a surplus pool, both of which were to be marketed by the authorities according to prescribed guidelines. A producer and packer of raisins sued, claiming inter alia that the Prorate Act violated national antitrust laws. The Court disagreed, holding that sovereign acts of states were not within the intended scope of the Sherman Act. Id. at 351-52, 63 S.Ct. at 313-14. "The state in adopting and enforcing the prorate program made no contract or agreement and entered into no conspiracy in restraint of trade or to establish monopoly but, as sovereign, imposed the restraint as an act of government which the Sherman Act did not undertake to prohibit." Id. at 352, 63 S.Ct. at 314.
 
 
 10
 More than thirty years passed before the Court again considered the question of state action immunity. In Goldfarb v. Virginia State Bar, 421 U.S. 773, 95 S.Ct. 2004, 44 L.Ed.2d 572 (1975), the Court found that a minimum fee schedule issued by the county bar association and enforced by the Virginia State Bar violated the Sherman Act. Because the state had voluntarily joined in the private anticompetitive activity of the bar association, no immunity applied. Id. at 791-92, 95 S.Ct. at 2015-16. In Goldfarb the Court first used language of compulsion, which has created substantial confusion in succeeding years. "It is not enough that ... anticompetitive conduct is 'prompted' by state action; rather, anticompetitive activities must be compelled by direction of the State acting as a sovereign." Id. at 791, 95 S.Ct. at 2015.
 
 
 11
 The following year the Court decided Cantor v. Detroit Edison Co., 428 U.S. 579, 96 S.Ct. 3110, 49 L.Ed.2d 1141 (1976). Here, too, state action immunity provided no protection. A private utility, subject to regulation by the state public service commission, issued "free" lightbulbs to residential customers. The bulb exchange program, although initiated by the utility, was included in the tariffs filed with the PSC. The existence of the tariff was not enough to immunize the utility from antitrust liability because the light bulb exchange program was not essential to the effective functioning of the state's utilities regulation. Id. at 598, 96 S.Ct. at 3121. The Court stated, "[t]here is no logical inconsistency between requiring such a firm to meet regulatory criteria insofar as it is exercising its natural monopoly powers and also to comply with antitrust standards to the extent that it engages in business activity in competitive areas of the economy." Id. at 596, 96 S.Ct. at 3120.
 
 
 12
 The following year in Bates v. State Bar of Arizona, 433 U.S. 350, 97 S.Ct. 2691, 53 L.Ed.2d 810 (1977), state action immunity was held to apply to enforcement by the state supreme court of disciplinary rules against attorney advertising. The Court noted, "we deem it significant that the state policy is so clearly and affirmatively expressed and that the State's supervision is so active." Id. at 362, 97 S.Ct. at 2698.
 
 
 13
 In 1978 the Court upheld the possibility of immunity for acts pursuant to state policy in two cases. In City of Lafayette v. Louisiana Power & Light Co., 435 U.S. 389, 98 S.Ct. 1123, 55 L.Ed.2d 364 (1978), the Court found that state action immunity would apply to acts of municipalities if those acts were undertaken according to clear state policy. "[T]he Parker doctrine exempts only anticompetitive conduct engaged in as an act of government by the State as sovereign, or, by its subdivisions, pursuant to state policy to displace competition with regulation or monopoly public service." Id. at 413, 98 S.Ct. at 1136 (plurality opinion). See also New Motor Vehicle Bd. of Cal. v. Orrin W. Fox Co., 439 U.S. 96, 99 S.Ct. 403, 58 L.Ed.2d 361 (1978) (Act was "a system of regulation, clearly articulated and affirmatively expressed, designed to displace unfettered business freedom," id. at 109, 99 S.Ct. at 411; immunity prevented liability).
 
 
 14
 In 1980 the Court set out the present controlling standard for determining whether a state agency's involvement in a regulatory scheme was sufficient to render the acts of private parties immune from antitrust liability. California Retail Liquor Dealers Ass'n v. Midcal Aluminum, Inc., 445 U.S. 97, 100 S.Ct. 937, 63 L.Ed.2d 233 (1980). The Midcal test incorporated and expanded on ideas expressed in earlier decisions.
 
 
 15
 California state laws required wine producers and wholesalers to file fair trade contracts and price schedules with the state. The terms of the applicable fair trade contracts and price lists controlled all wholesale transactions. Enforcement procedures were provided, including fines and license suspensions. 445 U.S. at 99-100, 100 S.Ct. at 940. Midcal, a wine wholesaler, was charged with selling wine at a price below that set by the fair trade contract. Midcal filed suit in the California courts, claiming that the system was a restraint of trade in violation of the Sherman Act. The state Court of Appeal found a Sherman Act violation and declined to find state action immunity. Id. at 100, 100 S.Ct. at 940. The United States Supreme Court affirmed.
 
 
 16
 The Court first considered the "threshold question ... whether California's plan for wine pricing violates the Sherman Act." Id. at 102, 100 S.Ct. at 941. The Court found that the system was resale price maintenance, a clear Sherman Act violation. Id. at 103, 100 S.Ct. at 942.
 
 
 17
 Once the violation had been established, the Court considered the question of state action immunity. The Court set out the controlling two part test: "First, the challenged restraint must be 'one clearly articulated and affirmatively expressed as state policy'; second, the policy must be 'actively supervised' by the State itself." Id. at 105, 100 S.Ct. at 943 (quoting Lafayette, 435 U.S. at 410, 98 S.Ct. at 1135 (plurality opinion)).
 
 
 18
 The Court determined that California's wine pricing system satisfied the first standard because "[t]he legislative policy is forthrightly stated and clear in its purpose to permit resale price maintenance." 445 U.S. at 105, 100 S.Ct. at 943. The program faltered, however, under the second standard. "The State neither establishes prices nor reviews the reasonableness of the price schedules; ... [t]he State does not monitor market conditions or engage in any 'pointed reexamination' of the program." Id. at 105-06, 100 S.Ct. at 943. Because no active supervision was found, the Court held that the state's actions were not immune from antitrust liability.
 
 
 19
 Since its Midcal decision the Court has considered the state action immunity issue in two additional cases, with differing results. See Community Communications Co., Inc. v. City of Boulder, 455 U.S. 40, 55, 102 S.Ct. 835, 842, 70 L.Ed.2d 810 (1982) (city's anticompetitive actions pursuant to general "home rule" statute were not immune from antitrust liability because there was no clearly established and affirmatively expressed state policy; state was neutral); Hoover v. Ronwin, --- U.S. ----, 104 S.Ct. 1989, 80 L.Ed.2d 590 (1984) (state supreme court, acting in legislative capacity, developed bar admission testing and operating procedures; Midcal test not required because acts in question were those of the sovereign itself rather than of a subdivision; id. at --- n. 33, 104 S.Ct. at 2001 n. 33). In neither of these cases has the Court shown any inclination to alter the terms of the Midcal standard.[3] Therefore, we apply those standards here.2. Application of Midcal Standard
 
 
 20
 a. State Policy
 
 
 21
 The district court found that it was New York State's policy to displace competition with regulation. Although the court found no specific language clearly stating this intent, it noted statutory provisions, state court decisions and recent legislative activity which supported its view. J.App. at 437-41.
 
 
 22
 Pervasive regulation alone is not adequate evidence of a state's policy to displace competition. Northrop Corp. v. McDonnell Douglas Corp., 705 F.2d 1030, 1056 (9th Cir.), cert. denied, --- U.S. ----, 104 S.Ct. 156, 78 L.Ed.2d 144 (1983); Phonetele, Inc. v. AT & T, 664 F.2d 716, 729 (9th Cir.1981), cert. denied, 459 U.S. 1145, 103 S.Ct. 785, 74 L.Ed.2d 992 (1983); cf. Cantor, 428 U.S. at 596-97, 96 S.Ct. at 3120-21. See also Areeda, Antitrust Immunity for "State Action" After Lafayette, 95 Harv.L.Rev. 435, 438 (1981) (not only state supervision is required; "the state must also intend to displace the antitrust laws"). As the district court noted, establishing the existence of such a policy is made more difficult by the legislature's failure to state clearly its intent to control the field. J.App. at 437. However, the district court correctly found that such intent can be gleaned from an examination of the broad regulatory scheme, state judicial decisions and recent legislative action.
 
 
 23
 The New York legislature granted the PSC wide ranging authority over telephone corporations.[4] See N.Y.Pub.Serv.Law Secs. 90-101-a. The statutory scheme encompasses virtually all aspects of the telephone business: the provision of services by telephone corporations, Sec. 91; rates, Secs. 92, 97; "general supervision" by the PSC of corporations and lines, Sec. 94, filing of annual reports, Sec. 95; ordering of repairs, improvements or changes, Sec. 98; granting of franchises, Sec. 99; transactions in stock Secs. 100-01; and reorganization of corporations, Sec. 101-a.
 
 
 24
 Moreover, the PSC is charged with conducting its activities in the public interest. State ex rel. Delaware & Hudson Co. v. Stevens, 197 N.Y. 1, 9, 90 N.E. 60 (1909); State ex rel. New York Tel. Co. v. Public Service Comm'n, 157 A.D. 156, 163, 141 N.Y.S. 1018, 1023 (1913) See also N.Y.Pub.Serv.Law Sec. 97.1 (commission shall determine "just and reasonable rates;" if commission finds "that the public interest requires a change in the rate, ... the commission may ... authorize an immediate, reasonable, temporary increase or decrease in such rate"); Sec. 97.2 ("the commission shall determine the just, reasonable, adequate, efficient and proper regulations"); Sec. 98 (commission may order repairs, improvements or changes if it believes they ought to be made "in order to promote the convenience of the public"); Sec. 100 ("No consent shall be given by the [PSC] to the acquisition of any stock in accordance with this section unless it shall have been shown that such acquisition is in the public interest."). This legislative charge is another indication of the state's intention to supplant the antitrust laws, also designed to protect the public interest, with a regulatory scheme.
 
 
 25
 Both the terms of the statute itself and recent action of the state legislature suggest that the regulatory scheme encompasses the same goals as those underlying the antitrust laws. The Public Service Law prevents any telephone corporation from giving "any undue or unreasonable preference or advantage to any person, corporation or locality." Sec. 91.3. Rate schedules must state "all privileges ... granted or allowed." Sec. 92.1. Corporations are not permitted to extend any contract privileges unless they do so uniformly with respect to all who are in similar situations. Sec. 92.2. The PSC may determine that a telephone company's rates "are unjustly discriminatory or unduly preferential." Sec. 97.1. See also Secs. 97.2, 100. These standards, against which the PSC is to measure the conduct of telephone corporations, suggest that the statute has as a basis the fundamental principles of antitrust law. If the Public Service Law were not intended to allow for a grant of state action immunity for actions taken pursuant to its provisions, there would be no need for the antitrust principles to appear in the text of the statute.
 
 
 26
 Recent legislative activity also confirms our belief that the district court interpreted New York State regulatory policy correctly. In 1981 the legislature suspended application of the provisions of Article 5 of the Public Service Law to telegraph corporations. The legislature stated:
 
 
 27
 [We] find[ ] that since competition exists in communication by telegraph the panoply of regulation required by the public service law does not appear to be necessary to assure adequate service at reasonable rates.... The legislature therefore declares that it shall be the purpose of this act to suspend regulation of communication by telegraph and to authorize the commission to reinstitute such regulation if, and to the extent, it determines it necessary to protect the public interest.
 
 
 28
 Legislative Findings and Declaration of Purpose, N.Y.L.1981, c. 414, Sec. 1.
 
 
 29
 In an Executive Memorandum accompanying the Act, Governor Carey stated:
 
 
 30
 In view of the competition, the extensive regulation which the Public Service Law requires to protect the consumer against monopoly practices in the telegraph industry no longer is necessary....
 
 
 31
 * * *
 
 
 32
 This bill, which applies solely to telegraph corporations, will stimulate competition and accelerate the development of innovative communication technologies for the benefit of the residents of New York State.
 
 
 33
 Memorandum filed with Senate Bill No. 5463. Attorney General Robert Abrams expressed his view in a memorandum for the Governor:
 
 
 34
 The Governor's Office has unequivocally assured my office that it was not the intent of this Act, to suspend application of Article 5 of the Public Service Law to any telecommunication service provided by a telephone company such as New York Telephone, the dominant supplier of telecommunications in this State. This assurance is critical.
 
 
 35
 Attorney General's Memorandum for the Governor Re Senate 5463 (July 2, 1981).
 
 
 36
 It is clear that both the executive and legislative branches of state government viewed regulation of telegraph corporations as unnecessary. We may assume that had the legislature determined that regulation was similarly unnecessary for telephone corporations it would have suspended application of the statute to those utilities for a similar test period. The fact that the legislature failed to do so leads inescapably to the conclusion that it viewed continued regulation of the telephone industry as necessary to displace competition in the public interest. See Capital Telephone Co. v. City of Schenectady, 560 F.Supp. 207, 210 n. 6 (N.D.N.Y.1983).
 
 
 37
 Although it might be appropriate for RTUs to function in an openly competitive marketplace, that decision rests with the legislature. Presently the statutes demonstrate the state's policy to displace competition with regulation.
 
 
 38
 Appellants argue, however, that, because the particular activities of which they complain are not directed by the legislature through the Public Service Law, there is no basis for a finding of an "affirmatively expressed state policy." This may be another way of saying that a compulsion requirement, which we have already rejected, should be read into the Midcal standard. See supra note 3. However, because it may be possible for specific activities to be addressed by the statute without being compelled by it, we will consider this argument separately.
 
 
 39
 The Supreme Court has never held that a comprehensive, specific legislative mandate is necessary to a finding of immunity from antitrust liability. To the contrary, a broader interpretation has been suggested. In Lafayette Justice Brennan wrote:
 
 
 40
 This does not mean, however, that a political subdivision necessarily must be able to point to a specific, detailed legislative authorization before it properly may assert a Parker defense to an antitrust suit. While a subordinate governmental unit's claim to Parker immunity is not as readily established as the same claim by a state government sued as such, we agree ... that an adequate state mandate for anti-competitive activities of cities and other subordinate governmental units exists when it is found "from the authority given a governmental entity to operate in a particular area, that the legislature contemplated the kind of action complained of."
 
 
 41
 435 U.S. at 415, 98 S.Ct. at 1138 (plurality opinion) (citation omitted; emphasis added).
 
 
 42
 Although this interpretation did not garner majority support on the Court, we consider it to be consistent with the purpose of state action immunity. We find no persuasive authority to the contrary. Where, as here, there is sufficient evidence that a state intended to supplant open competition with regulation, activities that are reasonably necessary or related to the subject of the legislation should be included within the scope of the immunity. See Cantor, 428 U.S. at 596, 96 S.Ct. at 3120 (light bulb exchange program was not a part of the utility's "natural monopoly power;" no immunity was present). See also Areeda, supra at 445-46 (citing Lafayette; noting that, because statutes are rarely clear in their statements of intent, the policy may be inferred "if the challenged restraint of competition is a necessary or reasonable consequence of engaging in the authorized activity"); Morgan, Antitrust and State Regulation: Standards of Immunity After Midcal, 35 Ark.L.Rev. 453, 464-65 (1981) ("[A]uthority to regulate may be implied in general delegations of authority. Any restraints based on such implied legislative decisions must, however, be basic to the regulatory program's functioning."). Therefore, to the extent that appellants' claim of a need for specificity is separable from the compulsion argument, we find it similarly unpersuasive.
 
 
 43
 In a recent decision the Sixth Circuit reached a similar conclusion. Hybud Equipment Corp. v. City of Akron, 742 F.2d 949 (6th Cir.1984). In evaluating the applicability of state action immunity to a waste disposal scheme, the court examined the anticompetitive restraint in light of the legislative intent. "If the challenged restraints are reasonably related to an agency's express powers and reasonably designed to promote the state aims within a designated field of regulation, they can be found to result from a 'clearly and affirmatively expressed state policy' to displace competition." Id. at 960-61. The court held that although the waste regulation statute itself was not an adequate basis for a finding of immunity, when combined with provisions allowing contractual arrangements for carrying out state policy it was sufficient evidence of a "reasonable relationship." Id. at 961-62. Therefore, the first Midcal requirement was satisfied. The evidence in the instant case is at least as strong; here too there is a "reasonable relationship" between the restraints in question and the state policy.
 
 B. Active Supervision
 
 44
 The district court found that the state legislature had "expressly conferred" powers upon the PSC which enabled it to review rates and other aspects of telephone company operations for reasonableness. J.App. at 442. Because the program requires "active state involvement in the operative anticompetitive decisions," the court found the state's supervision adequate to warrant a finding of immunity. Id. (citing P. Areeda, Antitrust Law p 212.7 (Supp.1982) at 71). Although we find the question to be a close one, we conclude that the district court's determination was correct. The Public Service Law provides for comprehensive, ongoing involvement by the state in the functioning of telephone corporations. This involvement is sufficient to meet the second Midcal requirement.
 
 
 45
 The regulatory scheme gives the PSC a broad range of powers: "The commission shall have general supervision of all ... telephone corporations and ... telephone lines within its jurisdiction ...." N.Y.Pub.Serv.Law Sec. 94.2. Within the ambit of "general supervision" fall such activities as examination of "all books, contracts, records, documents and papers," Sec. 94.3; and investigation of "any act done or omitted to be done," Sec. 96.1.[5] Procedures for the development and enforcement of rates are extensively covered by the statute. See N.Y.Pub.Serv.Law Sec. 92 (orders filing of rate schedules, provides for PSC hearings where changes in rate schedules are sought); Sec. 97 (PSC may hold hearing on rates either on receipt of complaint or on own motion; PSC shall determine reasonable rates and may authorize temporary rate changes). Moreover, any telephone corporation wishing to "issue stock, bonds, notes or other evidence of indebtedness ... when necessary for the acquisition of property, the construction, completion, extension or improvement of its facilities or the improvement or maintenance of its service within the state ..." must receive authorization from the commission. Sec. 101.
 
 
 46
 It is clear that the legislature intended the PSC's authority over telephone corporations to be very broad. This regulatory role is quite different from that of the State of California in Midcal. There, the Supreme Court found that no immunity was possible for the wine pricing program because the state's involvement did not constitute "active supervision." Midcal, 445 U.S. at 105-06, 100 S.Ct. at 943. "The State neither establishes prices nor reviews the reasonableness of the price schedules; nor does it regulate the terms of fair trade contracts. The State does not monitor market conditions or engage in any 'pointed reexamination' of the program." Id.
 
 
 47
 Here, by contrast, the state has authority to review any contracts entered into by the telephone corporations, Sec. 94.3, to examine "accounts, records and memoranda," Sec. 95.2, and to "investigate ... any act done or omitted to be done by any ... telephone corporation." Sec. 96.1. This role provides much more than a "gauzy cloak of state involvement [cast] over ... a private price-fixing agreement." Midcal, 445 U.S. at 106, 100 S.Ct. at 943. It would be inconsistent with such a broad regulatory scheme to find that the particular activities in question are subject to antitrust liability where the legislature so clearly intended to allow the PSC to control all activities which are a reasonable part of such a regulatory scheme. Therefore, we agree with the district court that this regulatory program constitutes "active supervision" under Midcal.[6] See Capital Telephone Co. v. City of Schenectady, 560 F.Supp. at 210-11 (comprehensive regulatory scheme satisfies "active supervision" requirement, state action immunity protects city from liability for denial of franchise to Capital); North v. New York Telephone Co., 1980-81 Trade Cas. p 63,675 (S.D.N.Y.1980) (rate structure of N.Y. Tel. is immune from antitrust liability; all aspects of rate structure are regulated and state "actively investigates, supervises and determines NYT's rates." Id. at 77,628).
 
 3. Additional Arguments
 
 48
 In an attempt to find controlling precedent in other telecommunications cases, appellants make two additional arguments. First, they insist that we should follow cases which have failed to find state action immunity in regulatory schemes which are primarily interstate in character. In short, they contend that the doctrine of state action immunity does not apply to the telecommunications industry, citing United States v. AT & T, 552 F.Supp. 131 (D.D.C.1982), aff'd mem., 460 U.S. 1001, 103 S.Ct. 1240, 75 L.Ed.2d 472 (1983), and that, even if it did, telecommunications regulations rarely meet the strict Midcal standards, citing Northeastern Tel. Co. v. AT & T, 497 F.Supp. 230 (D.Conn.1980), rev'd in part, vac. in part & remanded, 651 F.2d 76 (2d Cir.1981), cert. denied, 455 U.S. 943, 102 S.Ct. 1438, 71 L.Ed.2d 654 (1982); and Essential Communications Systems, Inc. v. AT & T, 610 F.2d 1114 (3d Cir.1979). Quoting liberally from United States v. AT & T, appellants argue that because N.Y. Tel.'s operations are closely tied to interstate commerce, no claim of state action immunity is possible.
 
 
 49
 These cases are clearly distinguishable, both on their facts and because appellants erroneously characterize the applicable standard as one of "exemption." It is true that the AT & T Court found that because Congress had extensively regulated the telecommunications industry, the area was one which is "national par excellence." 552 F.Supp. at 157-58. However, the court also noted that much of the conduct involved was not the subject of state regulation at all, while the remainder was subject only to tariffs. Id. at 158. The instant action is quite different because the activities are subject to comprehensive state regulation and there is no conflict here with federal legislative policy. See also Essential, 10 F.2d at 1125 (state law not clearly involved in the regulation in question; no exemption found in the 1934 Communications Act); and Northeastern, 651 F.2d at 82-84 & n. 7 (FCC regulation does not prevent liability for protective coupler requirement).
 
 
 50
 Appellants' characterization of the standard as "exemption" adds to the confusion. The standard which should be applied is that of preemption. See Handler, Antitrust-1978, 78 Colum.L.Rev. 1363, 1378-83 (1978) (explaining difference between exemption and preemption and noting that the presumptions that apply are different in the two situations). Because there is substantial state regulation of the activities in question here, in contrast to those involved in AT & T, the question should be whether Congress has preempted the field of telecommunications regulations. It is clear that Congress has not exclusively occupied this area; the extensive regulatory schemes in virtually every state demonstrate the viability of state interest in the field. In addition, there is no basis for a finding that there is an intolerable conflict between federal and state interests. Therefore, there is no preemption present here. In the absence of evidence of intent to preempt, a holding that a state may not circumvent the antitrust laws through its own regulatory scheme would challenge the federalism on which our governmental system is based.
 
 
 51
 Appellants' second argument is that any state action present here is not adequate to confer immunity on the defendants, citing Litton Systems, Inc. v. AT & T, 487 F.Supp. 942, 959 (S.D.N.Y.1980), aff'd on other grounds, 700 F.2d 785 (2d Cir.1983), cert. denied, --- U.S. ----, 104 S.Ct. 984, 79 L.Ed.2d 220 (1984) (district court found no state action immunity, holding that, as in Cantor, the program in question was initiated by the utility rather than by the state, which only approved tariffs; court of appeals affirmed on different grounds without reaching state action); Phonetele, Inc. v. AT & T, 664 F.2d 716, 735-36 (9th Cir.1981), cert. denied, 459 U.S. 1145, 103 S.Ct. 785, 74 L.Ed.2d 992 (1983) (filing of tariff alone is not adequate to confer state action immunity); and Sound, Inc. v. AT & T, 631 F.2d 1324, 1334-35 (8th Cir.1980) (no evidence of state policy requiring displacement of competition by regulation).
 
 
 52
 This argument also must fail. As we stated above, New York's current policy clearly favors the imposition of regulatory controls over competition in the telephone industry.[7] Moreover, the legislature has given the PSC a considerably more active role than the mere approval of tariffs. Therefore, the district court was clearly correct in concluding that on the facts of this case N.Y. Tel. is protected from federal antitrust liability by state action immunity.
 
 
 53
 The judgment of the district court is affirmed.
 
 PIERCE, Circuit Judge, dissenting:
 
 54
 I dissent. I cannot agree with the majority's conclusion that appellee's allegedly anticompetitive activities are protected from federal antitrust scrutiny by state action immunity. I do not believe that New York, by choosing to regulate the telephone industry, has acted to displace competition therein. Hence, I would hold that state action immunity is not available to appellee under the standards set forth by the Supreme Court in California Retail Liquor Dealers Association v. Midcal Aluminum, Inc., 445 U.S. 97, 100 S.Ct. 937, 63 L.Ed.2d 233 (1980).
 
 
 55
 The state statute upon which the majority relies in finding the alleged anticompetitive conduct protected requires only that telephone companies shall provide "adequate service" at "just and reasonable charges" without "unjust discrimination" or "unreasonable preference" and that the Public Service Commission ("PSC") shall have powers of "general supervision" over such companies. N.Y.Pub.Serv.Law Secs. 91, 94 (McKinney 1955). This vague mandate cannot satisfy the requirement of Midcal that anticompetitive conduct, to be exempt, must be "clearly articulated and affirmatively expressed as state policy." Midcal, 445 U.S. at 105, 100 S.Ct. at 943 (emphasis added).
 
 
 56
 Moreover, in Capital Telephone Company v. Pattersonville Telephone Company, 56 N.Y.2d 11, 451 N.Y.S.2d 11, 436 N.E.2d 461 (1982), the New York Court of Appeals explicitly held that the state Public Service Commission's approval of a practice challenged as anticompetitive will not preclude a private plaintiff's state antitrust action attacking that practice. In so deciding, the New York Court of Appeals necessarily concluded that the State's decision to regulate the telephone industry is not inconsistent with the principles of competition. Under these circumstances, the conduct challenged here cannot reflect an affirmative state policy and hence is not exempt from federal antitrust scrutiny. See Midcal, 445 U.S. at 105, 100 S.Ct. at 943.
 
 
 57
 State action immunity is based principally on considerations of federalism. It allows states a limited degree of autonomy and latitude in pursuing independent economic policies.[1] States may make choices concerning economic regulation even though those choices might otherwise violate the Sherman Act. However, the Sherman Act is fundamental national economic policy. See Midcal, 445 U.S. at 106, 100 S.Ct. at 943. Consequently, not every instance of state economic regulation gives rise to exemption from federal antitrust law: "The mere possibility of conflict between state regulatory policy and federal antitrust policy is an insufficient basis for implying an exemption from the federal antitrust laws." Cantor v. Detroit Edison Co., 428 U.S. 579, 596, 96 S.Ct. 3110, 3120, 49 L.Ed.2d 1141 (1976). Nor will every choice of a state that conflicts with the policies of the Sherman Act be respected: "[A] state does not give immunity to those who violate the Sherman Act by authorizing them to violate it, or by declaring that their action is lawful ...." Parker v. Brown, 317 U.S. 341, 351, 63 S.Ct. 307, 313, 87 L.Ed. 315 (1943) (quoted in Midcal, 445 U.S. at 106, 100 S.Ct. at 943). Thus, a state is at times free to supplant the Sherman Act's policy of free competition with one of actively regulated monopoly or oligopoly--but it may not defeat the Sherman Act without adopting a coherent policy toward anticompetitive activities and subjecting that policy to "pointed re-examination by the policymaker." Midcal, 445 U.S. at 105-06, 100 S.Ct. at 943; see Bates v. State Bar of Arizona, 433 U.S. 350, 362, 97 S.Ct. 2691, 2698, 53 L.Ed.2d 810 (1977).
 
 
 58
 The Supreme Court, in Midcal, established "two standards for antitrust immunity under Parker v. Brown. First, the challenged restraint must be 'one clearly articulated and affirmatively expressed as state policy'; second, the policy must be 'actively supervised by the State itself.' " Midcal, 445 U.S. at 105, 100 S.Ct. at 943 (quoting in part City of Lafayette v. Louisiana Power & Light, 435 U.S. 389, 410, 98 S.Ct. 1123, 1135, 55 L.Ed.2d 364 (1978) (plurality opinion)). These are independent requirements, and each must be fulfilled if a challenged restraint is to be considered exempt from federal antitrust scrutiny. The purpose of the two-pronged Midcal test is to insure both that the State makes a conscious choice to displace competition and that this choice is subject to critical re-examination. If both these ends are to be accomplished, it may not be assumed that the requirements are met whenever the State engages in economic regulation. Rather, as perusal of Lafayette, Cantor, Goldfarb v. Virginia State Bar, 421 U.S. 773, 95 S.Ct. 2004, 44 L.Ed.2d 572 (1975), and other decisions leading up to Midcal reveals, the test is to be applied strictly. In my opinion, the majority fails to make the proper strict application of the Midcal test to the facts of this case.
 
 
 59
 The majority holds that regulation of the telephone industry by the state Public Service Commission is sufficient to satisfy the "active supervision" prong of the Midcal test, and it may be that this conclusion is correct. However, the majority also holds that this same regulation clearly evinces the state legislature's choice to pursue a policy in conflict with that of the Sherman Act. The problem with this analysis is that it conflates the two requirements of Midcal making them one. Under the majority's analysis, regulation that fulfills the "active supervision" requirement of Midcal necessarily satisfies its demand that the challenged restraint be "clearly and affirmatively expressed as state policy." But, as already stated, not every instance of state economic regulation gives rise to exemption from federal antitrust laws. The Supreme Court has made clear that regulation alone is not sufficient to exempt challenged restraints from antitrust scrutiny.
 
 
 60
 In Goldfarb, 421 U.S. 773, 95 S.Ct. 2004, 44 L.Ed.2d 572 the Court recognized that the State Bar was given power to regulate the legal profession but nevertheless held that its price-fixing activities were not beyond the purview of the Sherman Act: "The fact that the State Bar is a state agency for some limited purposes does not create an antitrust shield that allows it to foster anticompetitive practices for the benefit of its members." Id. at 791, 95 S.Ct. at 2015. The Court went on to hold that because there was no evidence showing the Bar's price-fixing activities to be within the policy of the State as sovereign, those activities were not exempt from antitrust scrutiny. And in Cantor v. Detroit Edison Co., 428 U.S. 579, 96 S.Ct. 3110, 49 L.Ed.2d 1141, the Court rejected defendants' argument that because the state Public Utility Commission had approved a tariff containing the allegedly anticompetitive activity--distribution of free lightbulbs--the Sherman Act was inapplicable thereto. The Court reasoned that without a showing of actual conflict between the state regulatory policy and that of the Sherman Act there could be no implied exemption from the antitrust law. The Court found that because the activity challenged in Cantor was not compelled by the State, it should not be considered within the State's affirmative regulatory policy. As the Court stated in words applicable to this case:
 
 
 61
 Unquestionably there are examples of economic regulation in which the very purpose of the government control is to avoid the consequences of unrestrained competition .... But all economic regulation does not necessarily suppress competition. On the contrary, public utility regulation typically assumes that the private firm is a natural monopoly and that public controls are necessary to protect the consumer from exploitation. There is no logical inconsistency between requiring such a firm to meet regulatory criteria insofar as it is exercising its natural monopoly powers and also to comply with antitrust standards to the extent that it engages in business activity in competitive areas of economy.
 
 
 62
 Id. at 595-96, 96 S.Ct. at 3119-20.
 
 
 63
 Here, making what I consider to be the proper strict application of the Midcal test, I would hold that the activities of appellee, to the extent that they violate the Sherman Act, are not within the "clearly articulated and affirmatively expressed" policy of the State of New York. In finding appellee's allegedly anticompetitive conduct exempt from federal antitrust scrutiny, the majority relies upon the Public Service Commission's approval of that conduct. However, this approval is insufficient evidence that appellee's conduct reflects any affirmative policy of the State. I find it far from certain that the PSC decisions at issue here are anything more than determinations that the appellant has failed to prove that appellee's conduct violates the New York Public Service Law. Moreover, even if the Public Service Commission has mandated New York Telephone's actions, this is nevertheless insufficient to constitute a statement of policy of the State. The Public Service Commission is not the State itself. Therefore, before concluding that its actions have immunized a private defendant from antitrust liability, a court must ascertain whether the state "legislature [in granting the Public Service Commission power to regulate New York Telephone] contemplated the kind of action complained of." Community Communications Co. v. Boulder, 455 U.S. 40, 55, 102 S.Ct. 835, 842, 70 L.Ed.2d 810 (1982). As already noted, New York's Public Service Law provides only that telephone companies shall give "adequate service" at "just and reasonable charges" without "unjust discrimination" or "unreasonable preference" and that the PSC shall have powers of "general supervision" over such companies. N.Y.Pub.Serv.Law Secs. 91, 94. This vague grant of power evidences, at best, the legislature's neutrality toward Public Service Commission approval of anticompetitive conduct. "[P]lainly the requirement of 'clear articulation and affirmative expression' is not satisfied when the State's position is one of mere neutrality respecting the ... actions challenged as anticompetitive." Community Communications, 455 U.S. at 55, 102 S.Ct. at 842.
 
 
 64
 Moreover, to the extent that New York Telephone's conduct might actually violate the Sherman Act, that conduct would appear to directly conflict with New York State's regulatory policy. This conclusion follows from two facts. First, as all parties concede, the Public Service Commission seeks to promote competition in all aspects of the telephone industry. See Testimony of Paul Gioia, Chairman, Public Service Commission of the State of New York, before Legislative Commission on Science and Technology and Assembly Committee on Corporations, Authorities, and Commissions, February 1982. Thus, to the extent that the Public Service Commission has approved practices challenged herein, that decision logically would represent at most a determination that such practices are not anticompetitive. It would not imply that the PSC considers a certain level of anticompetitive behavior desirable. Second, and more importantly, the New York Court of Appeals has ruled--in a case involving the parties herein--that a Public Service Commission determination as to the legality of various practices will not bar a private plaintiff from pursuing a state antitrust action challenging those practices. Capital Telephone Company v. Pattersonville Telephone Company, et al., 56 N.Y.2d 11, 451 N.Y.S.2d 11, 436 N.E.2d 461 (1982). In that case, the N.Y. Court of Appeals stated that "discrimination which may be justifiable under ... the Public Service Law 'may still be unlawful if it can be shown to have actually restrained competition.' " Id. at 19, 451 N.Y.S.2d 11, 436 N.E.2d 461. Since New York's Donnelly Act, N.Y.Gen.Bus.Law Sec. 340 (McKinney 1968), is essentially a state version of the Sherman Act--and hence there is no evidence herein that New York State intended to displace its own, let alone federal, antitrust laws--the State's decision to regulate the telephone industry cannot be considered inconsistent with application of federal antitrust law to that industry. Thus, one must conclude that New York's antitrust law and Public Service Law fulfill different but complementary functions with regard to the telephone industry, and, further, that Public Service Commission regulation does not conflict with a policy of free competition in the telephone industry.[2]
 
 
 65
 For the foregoing reasons, I would conclude that New York has not decided to eliminate competition in the telephone industry but instead has decided to encourage competition through the dual means of careful regulation and application of antitrust law, state and federal. Under these circumstances, I would hold that appellee's allegedly anticompetitive activities are not exempt from the federal antitrust laws. See Cantor v. Detroit Edison Co., 428 U.S. at 595-96, 96 S.Ct. at 3119-20. I would reverse and remand accordingly.
 
 
 
 [1]
 Although plaintiffs' brief refers to Tri-Cities in the plural, many of the prior administrative and judicial opinions use the name Tri-City. We refer to plaintiff as Tri-Cities except where the singular form is necessary to remain consistent with prior decisions
 
 
 [2]
 Capital first filed a complaint with the PSC in late 1968, alleging that the tariff filed by N.Y. Tel. contained a charge against the mobile companies. Capital believed that it was being charged for costs for which its subscribers should have been billed directly. In re Capital Mobile Radio Service, Inc., 80 Pub.Util.Rep.3d (PUR) 445, 449 (Aug. 20, 1969). The PSC disagreed, finding that the fees were charged against the subscribers rather than against the carrier. The PSC also refused to grant Capital's request that it be allowed to bill N.Y. Tel. for calls originating from landline companies and received at mobile units. Id. at 452-53
 Tri-Cities filed a complaint with the FCC in 1969 requesting that N.Y. Tel. be required to interconnect with it on the same terms as it did with Tri-Cities' competitors. In re Petition of Tri-City Telephone Company, FCC No. 18741 (Recommended decision Nov. 17, 1972), J.App. at 285. The FCC denied the complaint, finding that Tri-Cities' operation at the time did not merit the establishment of a central office like those of its competitors. J.App. at 296. The FCC also rejected Tri-Cities' request that N.Y. Tel. divide revenues with it on the same basis as with Pattersonville Telephone Co., a landline company. The FCC noted that the costs of a landline company's mobile operations are not considered when revenue divisions are calculated, so that the calculations are not comparable. J.App. at 297.
 Capital filed another complaint with the PSC in 1970, requesting that its arrangements with N.Y. Tel. be revised. Hearings were held for six days between 1970 and 1972. The PSC found that the evidence did not support Capital's claims of discrimination and anticompetitive action. Pub.Serv.Comm'n Op. No. 73-8 (Mar. 12, 1973), J.App. at 212, 229. The PSC ordered N.Y. Tel. to continue to offer direct dial interconnection services to RCCs, but ordered Capital to pay for the services it had received. Stating that the relationship between RCCs and N.Y. Tel. was different than that between landline companies and the telephone company, the PSC found that the record disclosed no evidence of discrimination by N.Y. Tel. Id. at 231-32.
 Pursuant to a recommendation by the PSC in the 1973 action, Tri-Cities filed a petition for a certificate of public convenience and necessity. The PSC granted the certificate but rejected the toll revenue division plan offered by Tri-Cities because the marine service provided by Tri-Cities was not similar enough to landline service to allow toll division based on the standard formula. Pub.Serv.Comm'n Op. No. 74-21 (July 1, 1974), J.App. at 266-67.
 Next, Tri-Cities filed suit in the Appellate Division of the state supreme court requesting that the Commission's decision concerning the interconnection agreement be reversed. Tri-City Telephone Co. v. Alfred E. Kahn, 49 A.D.2d 126, 373 N.Y.S.2d 655 (1975). Noting that the applicable standard of review was a limited one, the court upheld the PSC's decision. Id. at 129, 373 N.Y.S.2d 655.
 In May 1978 Capital and Bakal again filed complaints with the PSC. J.App. at 329. These complaints contained allegations of "illegal, preferential and anticompetitive conduct" by N.Y. Tel. favoring plaintiffs' competitor, Pattersonville. Id. In a memo the Communications Division informed the PSC that the complaints were without merit. J.App. at 333. The Communications Division believed that the comparison between Bakal's services and those of Pattersonville was not appropriate and that Bakal/Capital were not being treated differently from any other RCC. Id. at 334, 336.
 Less than a year later, Capital, Bakal and Tri-Cities filed complaints with the FCC. These complaints were substantially similar to the 1978 PSC complaints. J.App. at 325-28. In April 1979 these complaints were dismissed. J.App. at 337.
 In February 1980, Capital, Bakal and Tri-Cities unsuccessfully petitioned this Court for an evidentiary hearing in a motion which essentially repeated the allegations of the prior administrative complaints. J.App. at 314. A similar complaint and request for hearing was filed with the FCC in May 1980. In May 1982 the FCC responded. Capital Telephone Co., Inc. v. New York Telephone Co., File No. E-80-17 (May 14, 1982). J.App. at 377. The FCC dismissed the complaint as to all allegations except those concerning discrimination in the use of direct distance dialing (DDD). As to those charges, the PSC ordered that access to the DDD network be provided to Capital at the same cost as to N.Y. Tel.'s own mobile service. J.App. at 382.
 
 
 [3]
 The plaintiffs argued strenuously that an additional "compulsion" requirement applies, thereby making it necessary to find that the specific acts in question were compelled by the State of New York. The Fifth Circuit has embraced this requirement. See United States v. Southern Motor Carriers Rate Conf., Inc., 702 F.2d 532 (5th Cir., Unit B. 1983) (en banc), cert. granted, --- U.S. ----, 104 S.Ct. 3508, 82 L.Ed.2d 818 (1984)
 In the Supreme Court's latest consideration of state action immunity, the Court's language indicates that no compulsion requirement should be read into the standard. Hoover v. Ronwin, --- U.S. ----, ----, 104 S.Ct. 1989, 1995, 80 L.Ed.2d 590 (1984).
 Closer analysis is required when the activity at issue is not directly that of the legislature or supreme court, but is carried out by others pursuant to state authorization.... In such cases, it becomes important to ensure that the anticompetitive conduct of the State's representative was contemplated by the State.... If the replacing of entirely free competition with some form of regulation or restraint was not authorized or approved by the State then the rationale of Parker is inapposite.
 Id. at ----, 104 S.Ct. at 1995 (footnote omitted; emphasis added). This language suggests that the Court does not intend that compulsion be required. The Sixth and Ninth Circuits apparently agree. See Hybud Equipment Corp. v. City of Akron, 742 F.2d 949 (6th Cir.1984) (applying two part Midcal test; no compulsion requirement included); United States v. Title Ins. Rating Bureau of Ariz., Inc., 700 F.2d 1247, 1252-53 (9th Cir.1983), cert. denied, --- U.S. ----, 104 S.Ct. 3509, 82 L.Ed.2d 819 (1984) (same). This view is endorsed by anti-trust scholars. See Areeda, Antitrust Immunity for "State Action" After Lafayette, 95 Harv.L.Rev. 435, 438 (1981) ("Compulsion, however, should not be read as an independent requirement for state action immunity; rather, its presence or absence should serve only as strong evidence about state intent."); Handler, Antitrust-1978, 78 Colum.L.Rev. 1363, 1384 (1978) (courts' use of compulsion as a requirement is "overreaction"); Morgan, Antitrust and State Regulation: Standards of Immunity After Midcal, 35 Ark.L.Rev. 453, 467-68 (1981) (compulsion was not included in the Court's statement of the standards but "it is likely to remain as a factor, presumably under the first standard").
 Contrary to appellants' assertion, this Circuit has never expressly adopted the compulsion requirement. See Litton Systems, Inc. v. AT & T, 487 F.Supp. 942 (S.D.N.Y.1980), aff'd on other grounds, 700 F.2d 785 (2d Cir.1983), cert. denied, --- U.S. ----, 104 S.Ct. 984, 79 L.Ed.2d 220 (1984) (district court discussed compulsion, but based decision on alternative grounds as well; this Court never reached issue); New York State Electric & Gas Corp. v. F.E.R.C., 638 F.2d 388 (2d Cir.1980), cert. denied sub nom. Village of Penn Yan v. New York State Electric & Gas Corp., 454 U.S. 821, 102 S.Ct. 105, 70 L.Ed.2d 93 (1981) (applying Midcal test, Court finds insufficient evidence of state policy; in dictum refers to Goldfarb's compulsion requirement as evidence of level of involvement which would be necessary). In fact, our most recent consideration of the question adheres to the two part test. See Battipaglia v. New York State Liquor Auth., 745 F.2d 166 (2d Cir.1984) (evaluating state action immunity as alternative holding of district court, but declining to rule on it; citing two part Midcal test as applicable standard).
 In line with our past decisions, our analysis proceeds according to the two part Midcal standard.
 
 
 [4]
 There is no question that this regulatory scheme applies to RCCs such as appellants herein. New York's courts have held that the regulation of RCCs is within the jurisdiction of the PSC. See Application of Radio Common Carriers of New York, Inc. v. Public Serv. Comm'n, 79 Misc.2d 600, 360 N.Y.S.2d 552 (Special Term, 1974), aff'd, 48 A.D.2d 756, 368 N.Y.S.2d 341 (1975); In re Digital Paging Systems, Inc. v. Pub. Serv. Comm'n, 46 A.D.2d 92, 360 N.Y.S.2d 931 (1974)
 
 
 [5]
 The PSC also has authority to inspect "property, equipment, buildings, plants, factories, offices, apparatus, machines, devices and lines," Sec. 94.2, and to develop accounting systems, Sec. 95.2. In addition, the PSC must provide for management and operations audits at least every five years, Sec. 96.6, and may order repairs and improvements in equipment or facilities, Sec. 98; approve the lease, assignment or sale of a franchise, Sec. 99.2; and allow telephone corporations to acquire or purchase stock in other similar entities, Sec. 101
 
 
 [6]
 The dissent misinterprets our analysis to hold that regulations that satisfy the second prong of the Midcal test must necessarily satisfy the first. Our analysis of the "state policy" prong incorporates evidence of legislative intent found in both the scheme itself and in recent legislative activity
 Where the regulatory scheme demonstrates that the state actively supervises the telephone industry, we need not look to wholly different sources to find support for first prong analysis. Where no clear expression of state policy exists, we may look to the breadth of the regulatory scheme, as a demonstration of the legislature's delegation of authority, in conducting our first prong Midcal analysis. Hybud Equipment Corp. v. City of Akron, 742 F.2d 949, 960 (6th Cir.1984) ("a legislative intent to displace competition may be inferred from the legislature's delegation of authority"). Our use of this particular regulatory scheme in evaluating both prongs of the Midcal test in no way suggests that satisfaction of one prong requires satisfaction of the other.
 The dissent also fails to credit our use of other evidence to support our finding, specifically, the legislature's recent action concerning the telegraph industry. While regulation alone is not enough to provide exemption from the antitrust laws, here there is more than mere regulation.
 
 
 [7]
 We note that New York's courts have interpreted the application of state antitrust laws to the Public Service Law differently. See Capital Telephone Co. v. Pattersonville Telephone Co., 56 N.Y.2d 11, 18, 451 N.Y.S.2d 11, 14, 436 N.E.2d 461, 464 (1982). Although proper application of the state action immunity doctrine should include consideration of state judicial decisions, we believe that a federal court may reexamine the issue precisely because the doctrine is based on the principles of federalism
 We disagree with the dissent in its belief that Pattersonville mandates a different result. We read that case to hold only that a "not illegal" ruling by the PSC does not collaterally estop the plaintiff from filing suit under the state antitrust laws. See Columbia Gas v. New York State Electric and Gas Corp., 28 N.Y.2d 117, 128-29, 320 N.Y.S.2d 57, 66, 268 N.E.2d 790, 796 (1971) (holding that failure to assert per se antitrust violation does not prevent fact-based, rule of reason analysis of antitrust allegations). We do not agree that the Pattersonville Court's decision in this limited context provides incontrovertible evidence of an affirmative state policy. In the absence of a clear statement of legislative intent, we cannot view this decision as more powerful than the recent legislative action deregulating the telegraph industry, but retaining regulatory authority over the telephone industry. The legislature has not taken advantage of the opportunity to repeal the application of L.1981, c. 414, Sec. 2; nor has it expanded the 1981 act to include the telephone industry. New York's legislature of course remains free to bring the actions of the state telephone industry within the scope of federal antitrust laws.
 
 
 [1]
 There may be limits other than those expressed in Midcal on a state's ability to impose a regime of economic regulation that conflicts with the principle of free competition mandated by the Sherman Act. For example, Judge Greene, in United States v. American Tel. & Tel. Co., 552 F.Supp. 131, 157-58 (D.D.C.1982), aff'd, 460 U.S. 1001, 103 S.Ct. 1240, 75 L.Ed.2d 472 (1983), suggested that state action immunity may be unavailable where the industry involved is by its nature "technologically and economically, a national network with interdependent components"--such as the telephone industry
 
 
 [2]
 As a general proposition, the interpretation of a state's law by the highest court of that state is conclusive. Scripto, Inc. v. Carson, 362 U.S. 207, 211, 80 S.Ct. 619, 621, 4 L.Ed.2d 660 (1960); General Trading Co. v. State Tax Commission, 322 U.S. 335, 337, 64 S.Ct. 1028, 1029, 88 L.Ed. 1309 (1944); Sutter Butte Canal Co. v. Railroad Commission, 279 U.S. 125, 139, 49 S.Ct. 325, 328, 73 L.Ed. 637 (1929). This rule, of course, is inapplicable when acceptance of such an interpretation would thwart vindication of a constitutional right, Indiana ex rel. Anderson v. Brand, 303 U.S. 95, 100, 58 S.Ct. 443, 446, 82 L.Ed. 685 (1938), but such a situation is not present here